## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| AMANDA COURCHESNE, as the administrator of the ESTATE OF JOSEPH COURCHESNE, AMANDA COURCHESNE, as the mother and natural guardian of C.C. and J.C., infants under the age of eighteen, and AMANDA COURCHESNE, individually, | Case No. 1:25-cv-00096 <br><br> **<u>COMPLAINT</u>** |
| Plaintiffs, | |
| – against – | |
| COÖS COUNTY, COÖS COUNTY DEPARTMENT OF CORRECTIONS, NORTHERN HUMAN SERVICES, SAVANNAH HARRISON, RN, DAVID OLSON, RN, ROBERT G. SOUCY, JR., DO, TYLER KELSEA, JAMES DAGESSE, ZACHARIE COVILL, GARRETT PURRINGTON, RICHARD BIRON, ZACHARY BENOIT and SCOTT COVEY, | |
| Defendants. | |

Plaintiffs Amanda Courchesne, as the administrator of the Estate of Joseph Courchesne,

Amanda Courchesne, as the mother and natural guardian of C.C. and J.C., infants under the age of

eighteen, and Amanda Courchesne, individually (collectively, "Plaintiffs"), by and through their

counsel, Perrone Law LLC and Cullenberg & Tensen, PLLC, complaining of Defendants Coös

County, Coös County Department of Corrections, Northern Human Services, Savannah Harrison,

RN, David Olson, RN, Robert G. Soucy, Jr., DO, Tyler Kelsea, James Dagesse, Zacharie Covill,

Garrett Purrington, Richard Biron, Zachary Benoit and Scott Covey (collectively, "Defendants"),

allege as follows:

**NATURE OF THE ACTION**

1.      This action arises from inhumane and unconstitutional treatment of a caring and loving father to two young children, Joseph Courchesne ("Courchesne"). While Courchesne was being detained on a misdemeanor charge, he was denied proper medical attention and treatment for serious medical conditions that are often fatal when not properly and timely treated. Despite Defendants being confronted with clear, objective signs that his already-serious medical conditions were worsening while he was in their custody, they chose to effectively do nothing to mitigate the situation and left Courchesne to die alone and naked in his cell when they knew that certain medical interventions would have easily prevented his tragic death and returned a loving father to his young children, who must now face the world without his guidance, support and love.

2.      On October 1, 2022, at 12:54 a.m., Courchesne was brought to the Coös County Department of Corrections ("CCDOC"), where he reported using alcohol every day for the past 7-years to cope with the death of his father. At that time, he had tremors in his hands, and a clinical institute withdrawal assessment ("CIWA") was performed to evaluate the severity of his withdrawal. His score was 22. This means his withdrawal severity was severe, with a score above the threshold for the most severe category of withdrawal (≥19). Persons with a CIWA score ≥19 require immediate intravenous administration of benzodiazepines in a hospital setting. It was also verified that he was prescribed and taking Suboxone as part of a medication-assisted treatment ("MAT") program for his opioid/substance use disorder ("OUD").

3.      Persons with concomitant alcohol withdrawal and opioid use disorder must have their OUD stabilized with medications (e.g., Methadone, Suboxone) concomitantly with treating alcohol withdrawal. However, instead of continuing to treat his OUD with Suboxone or another equivalent medication, Defendants abruptly stopped treating his OUD, pursuant to a CCDOC-

policy containing a blanket prohibition on MAT, stating: "<u>Suboxone or its generic equivalents will not be allowed into or administered in this facility under any circumstances</u>." This policy—which does not consider the needs of the individual inmate—not only results in the denial of necessary medical treatment for their serious medical needs, but when ongoing treatment is terminated, as it was here, it causes withdrawal effects and exacerbates concomitant alcohol withdrawal.

4.      When neither benzodiazepines nor Suboxone were given, his withdrawal worsened and, by 6:00 p.m., his tremors were worse, he was in a hypertensive crisis with a tachycardia of 124, and he began to hallucinate. This means his withdrawal worsened from severe to delirium tremens and required transfer to a hospital for management. Knowing he required benzodiazepines <u>and</u> Suboxone, Defendants did not provide them to Courchesne, despite his withdrawal symptoms worsening from tremors to hallucinations, which they knew would exacerbate his life-threatening condition. The refusal to provide a benzodiazepine and cease Suboxone is tragically ironic since Robert G. Soucy, Jr., DO ("Soucy") was involved in making that decision, and was later indicted on 12-counts of distribution of controlled substances, including benzodiazepines.

5.      After he was not provided adequate medical care when his alcohol withdrawal worsened from severe to delirium tremens, Courchesne suffered throughout the night from severe body tremors and profuse sweating. His hallucinations continued into the next day and, at 3:09 p.m. on October 2, 2022, he told his jailers that he was getting worse, at which point they claim to have given him a benzodiazepine, which they had to pour directly into his mouth because he "was unable to take the medication himself" "due to his uncontrollable shaking." However, toxicology screening performed on a sample obtained the day Courchesne died found <u>no</u> benzodiazepines in his system. This explains why his condition continued to worsen over the ensuing hours, leading to him "seeing demons and devils everywhere" by 3:44 p.m.

6.     To escape his hallucinations, Courchesne tied a pillowcase around his eyes and, when told to remove it, he said he had to do it because he kept seeing demons and devils, which kept trying to drag him to hell. Due to these withdrawal symptoms, he was sent to segregation at 4:42 p.m., where he was stripped naked and left with nothing more than a book, despite pleading not to be transferred because it "would worsen his condition." At 6:19 p.m., Defendants supposedly tried to offer Courchesne his evening medication—which were inadequate and did not include any treatment for his alcohol withdrawal or OUD—yet only attempted to provide it through his cell door, knowing he was unable to take it himself due to his alcohol withdrawal delirium symptoms, which had only worsened since he was transferred into segregation.

7.     When Courchesne did not take his medication, Defendants left him unmedicated in his cell, supposedly because they deemed it unsafe to enter. Yet, at 6:57 p.m., they did just that and entered his cell to retrieve the book he had previously been provided, a task that was performed without incident and without any attempt to provide him the medication he was unable to take less than 40-minutes earlier. During this encounter, an inmate in the adjacent cell heard Courchesne ask the correctional officers in his cell for medical attention, which they refused. That inmate heard those pleas for medical attention continue even after those officers left his cell, stating that from 6:30-7:00 p.m., Courchesne again requested medical attention, requested to see the nurse, and was calling out from his cell that he needed medical attention. His pleas were ignored.

8.     Due to the refusal to provide Courchesne with necessary medical care, his already-serious medical condition worsened and, after his pleas for medical attention were ignored, he was heard talking incoherently and debating with his hallucinations past 10:00 p.m. Thereafter, he continued to bang on his cell door and yell until "lights out," when there was a distinct change in his behavior. Since Defendants relied on a video monitoring system that was inadequate to detect

signs and symptoms of medical distress, Courchesne was not seen to be in distress after lights out nor was he seen unresponsive on the floor until 12:27 a.m.—despite video footage of his cell showing him falling to the floor numerous times without "much movement for a while" before he was found lying unresponsive, face-down on the floor of his cell.

9.      The correctional officer observing his cell through the video monitor requested a welfare check due to his change in behavior, yet one was not performed until 12:40 a.m., at which point Courchesne was found naked, unresponsive and discolored on the floor of his cell. The skin on his back was pale and the skin near his stomach was purple. Once he was turned on his back, it was observed that his eyes were filled with blood and his lips were a deep purple. This sort and extent of discoloration indicates that Courchesne had been dead for up to 2-hours when he was finally checked on at 12:40 a.m., showing the clear inadequacy of the video monitoring on which Defendants relied. He was pronounced dead, and an autopsy confirmed the obvious—the cause of his death at only 36-years-old was acute alcohol withdrawal (delirium tremens).

10.     Alcohol withdrawal delirium is often fatal when it is not appropriately and timely treated, especially when MAT for OUD is abruptly terminated, but, in this case, death was easily preventable since Courchesne was known to be going through alcohol withdrawal and taking MAT for OUD before he experienced any signs of delirium. Confronted with clear, objective signs that his life-threatening condition was worsening during their encounters with Courchesne, Defendants each chose to effectively do nothing to mitigate the situation when they each knew or should have known that medical interventions, as basic as medication and transfer to a hospital, would have not only improved his condition, but also have easily prevented his death. Instead, they acted with deliberate indifference to his serious medical needs and left his children fatherless.

## JURISDICTION AND VENUE

11.    Jurisdiction and venue are proper in this Court.

12.    This Court has jurisdiction over this lawsuit under 28 U.S.C. §§ 1331 and 1343(a)(3) and (4), as this action seeks redress for violations of constitutional and civil rights. Jurisdiction is also proper under the Fourth, Eighth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

13.    Plaintiffs request that this Court exercise supplemental jurisdiction over the causes of action alleging medical malpractice under 28 U.S.C. § 1367, as those causes of action are so related to the claims in this action within the original jurisdiction of this Court that they form part of the same case or controversy under Article III of the United States Constitution.

14.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

## THE PARTIES

15.    At all times hereinafter mentioned, Amanda Courchesne ("Mrs. Courchesne") is a resident of the State of New Hampshire, Coös County.

16.    At all times hereinafter mentioned, Mrs. Courchesne was lawfully married to Courchesne until his premature, wrongful death on October 3, 2022.

17.    At all times hereinafter mentioned, Courchesne died on October 3, 2022. A copy of the Certificate of Death is annexed hereto as Exhibit A.

18.    At all times hereinafter mentioned, Mrs. Courchesne was appointed as the administrator of the Estate of Joseph Courchesne. A copy of the Certificate of Appointment is annexed hereto as Exhibit B.

19.     At all times hereinafter mentioned, Courchesne was a qualified individual with a disability—alcohol and opioid use disorder—under the Americans with Disabilities Act and Rehabilitation Act.

20.     At all times hereinafter mentioned, Mrs. Courchesne is the mother and natural guardian of C.C. and J.C.

21.     At all times hereinafter mentioned, C.C. is a minor under the age of eighteen, the biological and lawful daughter of Courchesne and Mrs. Courchesne, and a resident of the State of New Hampshire, Coös County.

22.     At all times hereinafter mentioned, J.C. is a minor under the age of eighteen, the biological and lawful son of Courchesne and Mrs. Courchesne, and a resident of the State of New Hampshire, Coös County.

23.     At all times hereinafter mentioned, Defendant Coös County is a municipal entity created under the laws of the State of New Hampshire.

24.     At all times hereinafter mentioned, Defendant Coös County is authorized by law to operate a jail, through Defendant CCDOC, to house inmates and detainees, with a place of business at 168 County Farm Road, West Stewartstown, New Hampshire 03597.

25.     At all times hereinafter mentioned, Defendant Northern Human Services ("NHS") is a domestic non-profit corporation duly organized and existing under the laws of the State of New Hampshire, with its principal place of business located at 87 Washington Street, Conway, New Hampshire 03818.

26.     At all times hereinafter mentioned, Defendant Coös County, through Defendant CCDOC, entered into a contract with NHS to, *inter alia*, meet with inmates to describe available mental health and/or substance use services, provide mental health and/or substance use services,

consult with CCDOC staff to discuss inmate related problems, and provide on-site training for CCDOC staff up to two 3-or-4-hour trainings per year on topics involved with mental illness, behavioral problems or substance abuse as it relates to correction facilities.

27.     At all times hereinafter mentioned, Defendant Savannah Harrison, RN ("Harrison") was an agent, employee or servant of Defendant Coös County.

28.     At all times hereinafter mentioned, Harrison was an agent, employee or servant of CCDOC.

29.     At all times hereinafter mentioned, Harrison was an agent, employee or servant of NHS.

30.     At all times hereinafter mentioned, Harrison held herself out as a registered nurse, duly licensed in the State of New Hampshire.

31.     At all times hereinafter mentioned, Harrison provided medical care and treatment to inmates of the CCDOC, including Courchesne.

32.     At all times hereinafter mentioned, Harrison had actual knowledge that Courchesne had a serious medical need based on his concomitant alcohol withdrawal and OUD, that his life-threatening condition would be fatal if not timely and appropriately treated, and that medical interventions, including benzodiazepines, transfer to a hospital and continuation of his MAT with Suboxone, would easily prevent that harm.

33.     At all times hereinafter mentioned, Defendant David Olson, RN ("Olson") was an agent, employee or servant of Defendant Coös County.

34.     At all times hereinafter mentioned, Olson was an agent, employee or servant of CCDOC.

35.    At all times hereinafter mentioned, Olson was an agent, employee or servant of NHS.

36.    At all times hereinafter mentioned, Olson held himself out as a registered nurse, duly licensed in the State of New Hampshire.

37.    At all times hereinafter mentioned, Olson provided medical care and treatment to inmates of the CCDOC, including Courchesne.

38.    At all times hereinafter mentioned, Olson had actual knowledge that Courchesne had a serious medical need based on his concomitant alcohol withdrawal and OUD, that his life-threatening condition would be fatal if not timely and appropriately treated, and that medical interventions, including benzodiazepines, transfer to a hospital and continuation of his MAT with Suboxone, would easily prevent that harm.

39.    At all times hereinafter mentioned, Defendant Robert G. Soucy, Jr., DO ("Soucy") was an agent, employee or servant of Defendant Coös County.

40.    At all times hereinafter mentioned, Soucy was an agent, employee or servant of CCDOC.

41.    At all times hereinafter mentioned, Soucy was an agent, employee or servant of NHS.

42.    At all times hereinafter mentioned, Soucy held himself out as a Doctor of Osteopathic Medicine, duly licensed in the State of New Hampshire.

43.    At all times hereinafter mentioned, Soucy provided medical care and treatment to inmates of the CCDOC, including Courchesne.

44.    At all times hereinafter mentioned, Soucy had actual knowledge that Courchesne had a serious medical need based on his concomitant alcohol withdrawal and OUD, that his life-

threatening condition would be fatal if not timely and appropriately treated, and that medical interventions, including benzodiazepines, transfer to a hospital and continuation of his MAT with Suboxone, would easily prevent that harm.

45. At all times hereinafter mentioned, Defendant Tyler Kelsea ("Kelsea") was a correctional officer employed by Defendant Coös County.

46. At all times hereinafter mentioned, Kelsea was a correctional officer employed by Defendant CCDOC.

47. At all times hereinafter mentioned, Kelsea was responsible for, *inter alia*, the welfare and treatment of inmates, including Courchesne; supervising, monitoring and ensuring the well-being of inmates of the CCDOC, including Courchesne;  identifying and responding to inmates entering the CCDOC who, like Courchesne, may be intoxicated, suffering from a substance use disorder or experiencing withdrawal; detecting when inmates need emergency or urgent medical care; and initiating, requesting or otherwise ensuring access to emergency or urgent medical care when needed.

48. At all times hereinafter mentioned, Kelsea had actual knowledge that Courchesne had a serious medical need based on his concomitant alcohol withdrawal and OUD, that his life-threatening condition would be fatal if not timely and appropriately treated, and that medical interventions, including benzodiazepines, transfer to a hospital and/or continuation of his MAT with Suboxone, would easily prevent that harm.

49. At all times hereinafter mentioned, Defendant James Dagesse ("Dagesse") was a correctional officer employed by Defendant Coös County.

50. At all times hereinafter mentioned, Dagesse was a correctional officer employed by Defendant CCDOC.

51.     At all times hereinafter mentioned, Dagesse was responsible for, *inter alia*, the welfare and treatment of inmates, including Courchesne; supervising, monitoring and ensuring the well-being of inmates of the CCDOC, including Courchesne; identifying and responding to inmates entering the CCDOC who, like Courchesne, may be intoxicated, suffering from a substance use disorder or experiencing withdrawal; detecting when inmates need emergency or urgent medical care; and initiating, requesting or otherwise ensuring access to emergency or urgent medical care when needed.

52.     At all times hereinafter mentioned, Dagesse had actual knowledge that Courchesne had a serious medical need based on his concomitant alcohol withdrawal and OUD, that his life-threatening condition would be fatal if not timely and appropriately treated, and that medical interventions, including benzodiazepines, transfer to a hospital and continuation of his MAT with Suboxone, would easily prevent that harm.

53.     At all times hereinafter mentioned, Defendant Zacharie Covill ("Covill") was a correctional officer employed by Defendant Coös County.

54.     At all times hereinafter mentioned, Covill was a correctional officer employed by Defendant CCDOC.

55.     At all times hereinafter mentioned, Covill was responsible for, *inter alia*, the welfare and treatment of inmates, including Courchesne; supervising, monitoring and ensuring the well-being of inmates of the CCDOC, including Courchesne; identifying and responding to inmates entering the CCDOC who, like Courchesne, may be intoxicated, suffering from a substance use disorder or experiencing withdrawal; detecting when inmates need emergency or urgent medical care; and initiating, requesting or otherwise ensuring access to emergency or urgent medical care when needed.

56.     At all times hereinafter mentioned, Covill had actual knowledge that Courchesne had a serious medical need based on his concomitant alcohol withdrawal and OUD, that his life-threatening condition would be fatal if not timely and appropriately treated, and that medical interventions, including benzodiazepines, transfer to a hospital and continuation of his MAT with Suboxone, would easily prevent that harm.

57.     At all times hereinafter mentioned, Defendant Garrett Purrington ("Purrington") was a correctional officer employed by Defendant Coös County.

58.     At all times hereinafter mentioned, Purrington was a correctional officer employed by Defendant CCDOC.

59.     At all times hereinafter mentioned, Purrington was responsible for, *inter alia*, the welfare and treatment of inmates, including Courchesne; supervising, monitoring and ensuring the well-being of inmates of the CCDOC, including Courchesne;  identifying and responding to inmates entering the CCDOC who, like Courchesne, may be intoxicated, suffering from a substance use disorder or experiencing withdrawal; detecting when inmates need emergency or urgent medical care; and initiating, requesting or otherwise ensuring access to emergency or urgent medical care when needed.

60.     At all times hereinafter mentioned, Purrington had actual knowledge that Courchesne had a serious medical need based on his concomitant alcohol withdrawal and OUD, that his life-threatening condition would be fatal if not timely and appropriately treated, and that medical interventions, including benzodiazepines, transfer to a hospital and continuation of his MAT with Suboxone, would easily prevent that harm.

61.     At all times hereinafter mentioned, Defendant Richard Biron ("Biron") was a sergeant employed by Defendant Coös County.

62.   At all times hereinafter mentioned, Biron was a sergeant employed by Defendant CCDOC.

63.   At all times hereinafter mentioned, Biron was responsible for, *inter alia*, the welfare and treatment of inmates, including Courchesne; supervising, monitoring and ensuring the well-being of inmates of the CCDOC, including Courchesne; identifying and responding to inmates entering the CCDOC who, like Courchesne, may be intoxicated, suffering from a substance use disorder or experiencing withdrawal; detecting when inmates need emergency or urgent medical care; and initiating, requesting or otherwise ensuring access to emergency or urgent medical care when needed.

64.   At all times hereinafter mentioned, Biron had actual knowledge that Courchesne had a serious medical need based on his concomitant alcohol withdrawal and OUD, that his life-threatening condition would be fatal if not timely and appropriately treated, and that medical interventions, including benzodiazepines, transfer to a hospital and continuation of his MAT with Suboxone, would easily prevent that harm.

65.   At all times hereinafter mentioned, Defendant Zachary Benoit ("Benoit") was a correctional officer employed by Defendant Coös County.

66.   At all times hereinafter mentioned, Benoit was a correctional officer employed by Defendant CCDOC.

67.   At all times hereinafter mentioned, Benoit was responsible for, *inter alia*, the welfare and treatment of inmates, including Courchesne; supervising, monitoring and ensuring the well-being of inmates of the CCDOC, including Courchesne; identifying and responding to inmates entering the CCDOC who, like Courchesne, may be intoxicated, suffering from a substance use disorder or experiencing withdrawal; detecting when inmates need emergency or

urgent medical care; and initiating, requesting or otherwise ensuring access to emergency or urgent medical care when needed.

68.     At all times hereinafter mentioned, Benoit had actual knowledge that Courchesne had a serious medical need based on his concomitant alcohol withdrawal and OUD, that his life-threatening condition would be fatal if not timely and appropriately treated, and that medical interventions, including benzodiazepines, transfer to a hospital and continuation of his MAT with Suboxone, would easily prevent that harm.

69.     At all times hereinafter mentioned, Defendant Scott Covey ("Covey") was a correctional officer employed by Defendant Coös County.

70.     At all times hereinafter mentioned, Covey was a correctional officer employed by Defendant CCDOC.

71.     At all times hereinafter mentioned, Covey was responsible for, *inter alia*, the welfare and treatment of inmates, including Courchesne; supervising, monitoring and ensuring the well-being of inmates of the CCDOC, including Courchesne;  identifying and responding to inmates entering the CCDOC who, like Courchesne, may be intoxicated, suffering from a substance use disorder or experiencing withdrawal; detecting when inmates need emergency or urgent medical care; and initiating, requesting or otherwise ensuring access to emergency or urgent medical care when needed.

72.     At all times hereinafter mentioned, Covey had actual knowledge that Courchesne had a serious medical need based on his concomitant alcohol withdrawal and OUD, that his life-threatening condition would be fatal if not timely and appropriately treated, and that medical interventions, including benzodiazepines, transfer to a hospital and continuation of his MAT with Suboxone, would easily prevent that harm.

## **FACTUAL BACKGROUND**

73.     Courchesne was brought to the CCDOC on October 1, 2022, at 12:54 a.m., at which time he was a pre-trial detainee being held on one count of Violation of Restraining Order, a Class A Misdemeanor. He advised CCDOC, through its agents, servants and employees, including, but not limited to, Purrington, that he was consuming a half gallon of hard liquor per day and, as a result, would be going through alcohol withdrawal symptoms. It was also confirmed Courchesne had high blood pressure and was prescribed Suboxone—the first-line treatment for OUD—as part of a MAT program for his OUD.

74.     CCDOC knew alcohol withdrawal and OUD are serious medical conditions, and that the former is often fatal, especially when concomitant with the latter, if not appropriately and timely treated. Leading up to Courchesne being detained at the CCDOC, there was a significant increase in the number of detainees requiring detoxification treatment, making its agents, servants and employees well-aware that alcohol and substance abuse withdrawal are serious, potentially fatal medical conditions. In the Annual Report of Coös County for the Year Ending December 31, 2022, the Superintendent of Corrections, Benjamin Champagne, stated:

> substance abuse plague[s] our population . . . The percentage of offenders needing detoxification protocols has increased significantly over this past year. We are seeing detox cases from several abused substances, ranging from opioid abuse, methamphetamines, and alcohol . . . Offenders with Substance Use Disorders (SUD) are very common.

https://www.cooscountynh.us/sites/g/files/vyhlif4291/f/pages/2022_cty_report_reduced_size.pdf

(last visited September 27, 2024).

75.     The United States Department of Justice issued Guidelines for Managing Substance Withdrawal in Jails ("DOJ Guidelines") and, in its fact sheet, confirms just how common substance use disorder is in jail settings and the serious health complications that can result from failing to

recognize and manage it, stating: "More than 60 percent of individuals sentenced to jail have a substance use disorder (SUD) . . . Failing to recognize and manage substance withdrawal can lead to serious health complications and even death." https://bja.ojp.gov/doc/wmg-flyer.pdf (last visited September 27, 2024).

76.     While substance withdrawal can lead to death, the DOJ Guidelines make clear that death and suffering due to withdrawal from alcohol and other substances is preventable: "Death and suffering due to withdrawal from opioids, alcohol, and other substances are preventable. Local government officials, jail administrators, correctional officers, and health care professionals have an opportunity to save lives and promote the wellbeing of individuals in jail, an opportunity bound by legal obligations set forth in the Americans with Disabilities Act and various federal civil rights acts." DOJ Guidelines, at Foreword.

**A.  Defendants Knew Courchesne Had Serious Medical Needs**

77.     On October 1, 2022, at 7:40 a.m., Harrison was escorted by Covill into room 2-217 of the CCDOC to perform a rapid COVID-19 test on Courchesne, at which time she observed tremors in both of his hands. Courchesne told Harrison that he used alcohol every day for the past 7-years to cope with the death of his father. Harrison then performed a clinical institute withdrawal assessment ("CIWA") to assess the severity of his alcohol withdrawal. His score was 22—which means his alcohol withdrawal severity was severe at that time since he was not yet demonstrating complicated symptoms indicative of delirium, such as hallucinations or confusion:

| TABLE 1.   Alcohol Withdrawal Severity. | | |
|---|---|---|
| **Severity Category** | **Associated CIWA-Ar Range*** | **Symptom Description** |
| *Mild* | CIWA-Ar < 10 | Mild or moderate anxiety, sweating and insomnia, but no tremor |
| *Moderate* | CIWA-Ar 10-18 | Moderate anxiety, sweating, insomnia, and mild tremor |
| *Severe* | CIWA-Ar ≥19 | Severe anxiety and moderate to severe tremor, but not confusion, hallucinations, or seizure |
| *Complicated* | CIWA-Ar ≥19 | Seizure or signs and symptoms indicative of delirium – such as an inability to fully comprehend instructions, clouding of the sensorium or confusion – or new onset of hallucinations |

The American Society of Addiction Medicine Clinical Practice Guideline on Alcohol Withdrawal Management ("ASAM Guidelines"), available at https://downloads.asam.org/sitefinity-production-blobs/docs/default-source/quality-science/the_asam_clinical_practice_guideline_on_alcohol-1.pdf?sfvrsn=ba255c2_0 (last visited September 23, 2024).

78.     Harrison also independently verified that Courchesne was prescribed Suboxone as part of a MAT program to treat his OUD. This means that in addition to suffering severe alcohol withdrawal, Courchesne was also suffering from OUD. Suboxone is the first-line medication used to treat OUD. Since it contains Buprenorphine, Suboxone is a partial opioid agonist, which means that it binds to opioid receptors in the brain and produces an effect similar to opioids, but to a lesser degree. Because it occupies opioid receptors, Suboxone can produce withdrawal effects similar to opioids if treatment with it is abruptly terminated.

79.     The ASAM Guidelines are the "standards of care for alcohol withdrawal management in both ambulatory and inpatient settings." ASAM Guidelines, p. 3. Those guidelines state that persons with severe alcohol withdrawal should receive benzodiazepines and, when they are also receiving therapy for OUD, their OUD should be stabilized by continuing that therapy and they "should be admitted and managed in a hospital setting . . . with the resources to manage increased risk of respiratory depression and other complications."  This is consistent with the National Commission on Correctional Health Care standards, which state:

**Standard**

Protocols exist for managing inmates under the influence of alcohol or other drugs and those undergoing withdrawal from alcohol, sedatives, or opioids.

**Compliance Indicators**

* * *

4. Inmates experiencing severe or progressive intoxication (overdose) or severe alcohol withdrawal are transferred immediately to a licensed acute care facility.

\* \* \*

8. The facility has a policy that addresses the management of inmates . . . on methadone or similar substances. Inmates entering the facility on such substances have their therapy continued, or a plan for appropriate treatment of the methadone withdrawal syndrome is initiated.

A copy of the National Commission on Correctional Health Care ("NCCHC") Standards is attached as Exhibit C. Suboxone is a similar substance to methadone, as both are medications used to treat OUD and both can result in withdrawal effects similar to opioids when treatment with them is abruptly terminated.

80.    The foregoing establishes that Courchesne was suffering from not just one, but two separate medical conditions mandating treatment (severe alcohol withdrawal and OUD) upon his intake evaluation on October 1, 2022, at 7:40 a.m. These medical conditions were so serious that all recognized standards—including the NCCHC Standards that were designed for the specific purpose of ensuring that inmates receive constitutionally appropriate correctional health care—required Courchesne to be immediately transferred to an acute care facility, such as a hospital, for immediate treatment with benzodiazepines and Suboxone (or similar opioid therapy).

81.    Following his intake evaluation, Courchesne made a phone call at 1:58 p.m. that was monitored and recorded by the CCDOC, during which he stated: "I'm fucking DTing [i.e., detoxing] bad in here." He also confirmed that his legally prescribed Suboxone treatment—which he had been taking for numerous years before his detainment—was abruptly terminated, which contributed to his withdrawals, stating: "No liquor and no Subs [i.e., Suboxone], shaking like a leaf and cold as fuck," which is further substantiated by the tremors and tachycardia documented by Harrison during her 2:00 p.m. encounter with Courchesne.

82.    When neither benzodiazepines nor Suboxone were given, his withdrawal worsened from severe to complicated and, by 6:00 p.m., he was suffering from symptoms indicative of alcohol withdrawal delirium, which were exacerbated by his concomitant Suboxone withdrawal from the termination of treatment for his OUD. During her 6:00 p.m. encounter with Courchesne, Harrison noted that his "tremors were getting worse," his blood pressure and pulse were high (BP: 200/140, Pulse: 124), and she "had to help steady his hand and put the cup to his lips to sip water and swallow the pills."[1]

83.    Harrison further noted that during her 6:00 p.m. encounter, Courchesne informed her that he was experiencing symptoms indicative of delirium, specifically hallucinations:

> After taking the meds he said "you wanted me to tell you if I was seeing things and I am seeing smoke and I saw what look like a cat in the corner[.]"

84.    This means his alcohol withdrawal worsened from severe with minor hand tremors to complicated with symptoms indicative of delirium (hallucinations) and tremors severe enough that he could not steady his hand to sip water from a cup. The ASAM Guidelines require persons suffering from alcohol withdrawal delirium have "immediate intravenous access for administration of drugs and fluids," including benzodiazepines, which are "the first-line agents for managing alcohol withdrawal delirium." The ASAM Guidelines explain that the goal or therapeutic endpoint of such treatment is to control agitation associated with delirium:

> The goal or therapeutic endpoint of this recommendation is to help control agitation associated with delirium. Patient should be in a level of sedation where they are awake, but have a tendency to fall asleep unless stimulated.

---

[1] According to the medication record, Courchesne was given medications during his detainment, including clonidine, a multivitamin, thiamine (vitamin B1), Bentyl (also known as Dicycloverine, which is a gut antispasmodic used to treat irritable bowel syndrome), Ibuprofen, and hydroxyzine (used to treat itching caused by allergies, among other symptoms), https://www.therecoveryvillage.com/alcohol-abuse/alcohol-and-hydroxyzine/ (last visited September 27, 2024)). None of these medications treat alcohol withdrawal or OUD.

85.    The Federal Bureau of Prisons Clinical Guidance for the Detoxification of Chemically Dependent Inmates ("BOP Guidelines") confirms the need to give benzodiazepines to all inmates at risk of severe withdrawal: "Benzodiazepines are the mainstay of alcohol withdrawal treatment in the correctional setting." https://www.bop.gov/resources/pdfs/detoxification.pdf (last visited October 24, 2024). The BOP Guidelines further confirm the need for intravenous access for administration of benzodiazepines in the hospital setting for all patients at risk of severe alcohol withdrawal—such as Courchesne—stating:

> IV access should be established in all patients who are at risk of severe withdrawal. All patients with seizures or delirium tremens should be given IV benzodiazepines. IV administration should only be considered in the hospital/inpatient setting.

BOP Guidelines at p. 7 (defining severe withdrawal as a CIWA Score >15).

86.    This is in-line the DOJ Guidelines—which are specifically designed to "help jail administrators, custody staff, jail-based health care professionals, local government officials, and community providers"—which make clear that Courchesne should have been sent to a hospital no later than October 1, 2022, at 6:00 p.m., stating: "A patient who develops hallucinations should be transferred to a higher level of care for treatment . . . Benzodiazepine medication should be given concurrently with the call for transport . . ." DOJ Guidelines at p. 32. In fact, the DOJ Guidelines required his transfer upon intake at 7:40 a.m. given his CIWA and comorbid OUD:

> A-19. While most patients experiencing alcohol withdrawal may be managed in the facility, if the following indications are present, **the patient should be transferred to a hospital** (unless the jail has hospital-level capacity):
>
> A. Agitation or severe tremor persists despite having received multiple doses of medication.
> B. Severe signs or symptoms, such as . . . marked agitation, hallucinations, confusion . . .
> C. Existing medical or psychiatric condition worsens.

     D.  Unstable vital signs (low/high blood pressure or heart rate) that are not responsive to medications provided to treat withdrawal.[2]

     E.  Severe or ongoing oversedation.

     F.  Patient has moderate or high CIWA-Ar scores and significant comorbidity.

A-20. Patients with severe withdrawal (CIWA $\geq$19) or complicated symptoms (e.g., seizures, delirium, hallucinations) should typically be transferred to a setting with 24-hour medical care available, (e.g., an emergency department or hospital).

https://bja.ojp.gov/doc/guidelines-managing-substance-withdrawal-jails.pdf (last visited September 24, 2024) (emphasis added).

87.     Not later than 7:40 a.m., Defendants knew that Courchesne had a high CIWA score and a significant comorbidity consisting of OUD. DOJ Guidelines at p. 91 (defining comorbidity to include a concurrent substance use disorder). When Defendants failed to provide the necessary medical care to treat his alcohol withdrawal and OUD, they were presented with worsening signs and symptoms by 6:00 p.m. on October 1, 2022, which provided yet another opportunity for them to reevaluate their prior shortcomings and arrange for Courchesne to be administered medication (i.e., a benzodiazepine and Suboxone) concurrent with his transfer to a hospital.

88.     For example, during her 6:00 p.m. encounter, Harrison was confronted with clear, objective signs that 5-out-of-6 of the indications requiring transfer to an emergency department or hospital were present: (1) his tremors persisted and "were getting worse," despite 3-doses of medication having been given;[3] (2) he was hallucinating; (3) his existing medical conditions were

---

[2] The following is a summary of the blood pressure categories: Normal: Systolic <120 and Diastolic <80; Elevated: Systolic 120-129 and Diastolic less than 80; Stage 1 Hypertension: Systolic 130-139 or Diastolic 80-89; Stage 2 Hypertension: Systolic 140+ or Diastolic 90+; Hypertensive Crisis: Systolic >180 and/or Diastolic >120. https://www.heart.org/en/health-topics/high-blood-pressure/understanding-blood-pressure-readings (last visited September 24, 2024). The normal heart rate is 60-100 beats per minute, with tachycardia occurring when the heart beats 100+ beats per minute. https://www.heart.org/en/health-topics/arrhythmia/about-arrhythmia/tachycardia--fast-heart-rate.

[3] As discussed elsewhere herein, the medications Courchesne were given were not treatments for alcohol withdrawal or OUD and, to the extent that was their intended purposes, they were wholly inadequate and lacking any medical basis to believe they would treat either alcohol withdrawal or OUD.

getting worse to the point he was unable to take medication without assistance; (4) he was in a hypertensive crisis with a tachycardia of 124; and (5) his CIWA score was 22 with complicated symptoms indicative of delirium and a significant comorbidity consisting of OUD.

89.     Further, his CIWA score of 22 with symptoms consisting of hallucinations required immediate intravenous access for administration of fluids and drugs, which should have included a benzodiazepine. Without such treatment in the hospital setting, delirium is often fatal, especially accompanied by an OUD for which treatment is abruptly discontinued. Knowing that due to the high mortality rate of his condition, Courchesne "was going to need a benzo," Harrison did not provide him with that medication, nor did she initiate or discuss the possibility of a transfer to a hospital setting, and instead, she discontinued his Suboxone.

90.     Harrison reported the foregoing to Soucy during her 6:00 p.m. encounter and, after bringing him up to date on the status of Courchesne and his alcohol withdrawal delirium, Soucy and Harrison chose to withhold treatment with a benzodiazepine, despite knowing that without such treatment his condition would only worsen, he would become agitated, and he would continue to suffer needlessly. Knowing he required benzodiazepines, Harrison and Soucy withheld from him that essential medication, despite his symptoms worsening from tremors to hallucinations and despite his condition often being fatal when that medication is not timely given.

91.     After he was not given essential care when his alcohol withdrawal worsened from severe to complicated, Courchesne suffered throughout the night from severe body tremors and profuse sweating. Notably, the description of the tremors previously noted were described in relation to his hands, so the severe body tremors and profuse sweating were objective signs that his condition was continuing to worsen. Specifically, with respect to the night of October 1, 2022

and morning hours of October 2, 2022, Covill stated: "I observed Inmate Courchesne suffering from severe body tremors and was profusely sweating during every interaction."

92.    His hallucinations also continued and, on October 2, 2022, at 3:09 p.m., Courchesne tapped on the camera and told Dagesse that he was feeling worse. Dagesse notified both Olson and Biron of this interaction and, at 3:17 p.m., Dagesse, Olson and Kelsea entered Cellblock 306 and claim to have given Courchesne a benzodiazepine known as Klonopin, which Olson had to pour into his mouth because he "was unable to take the medication himself" "due to his uncontrollable shaking." However, toxicology screening done on October 3, 2022, indicates that Courchesne was not actually given Klonopin, and no benzodiazepines were found in his system.

93.    Even after Klonopin was supposedly given, Courchesne's already-serious medical condition continued to worsen. At 3:40 p.m., Courchesne tied a pillowcase around his eyes and began to stumble around Cellblock 306 before laying on the floor. At 3:44 p.m., Kelsea responded to Cellblock 306, at which time Courchesne told him that he had to tie the pillowcase around his eyes because "he kept seeing demons and devils everywhere." He then started wandering around to show Kelsea "where he kept seeing the demons, . . . grabbed the pillowcase again and put it over his eyes and sat at the table." Kelsea stated that:

> During this time Inmate Courchesne kept telling me about the demons and devils and that they kept trying to drag him to hell.

94.    By 4:42 p.m., Biron saw that Courchesne was "getting worse," despite Klonopin supposedly being given more than an hour earlier (either he was not responding to the medication or, as toxicology indicates, it was never given to him),[4] and ordered him to be transferred to Cellblock 307-A, where he was stripped of his clothes and placed in an anti-suicide smock. While

---

[4] Klonopin takes an hour to start working and reaches its peak between one to four hours after the initial dosage is given. Since Courchesne continued to worsen more than an hour after he was supposedly given Klonopin, it was or should have been known that either he was not responding to treatment, or it was never given.

he was being transferred by Dagesse and Kelsea, Courchesne exhibited new signs of severe confusion by explaining that his friend, Mike, "would be here to pick him up momentarily for a doctor appointment" that "he couldn't miss."

95.    While Dagesse and Kelsea were transferring him to Cellblock 307-A, Courchesne made his first request for medical attention and transfer to the hospital. Since Courchesne had not requested medical attention or transfer to a hospital during his prior encounters with either Dagesse or Kelsea, this request suggests that his already-serious medical condition was worsening and that he was in particular distress during this encounter. Dagesse and Kelsea both denied his request for medical attention and transfer to a hospital and, instead, left him alone in his cell, wearing nothing but an anti-suicide smock, begging for medical attention and his clothes back.

96.    At 6:19 p.m., Dagesse, Kelsea and Olson supposedly tried to offer Courchesne a his evening medication,[5] yet only attempted to provide it through his cell door chase, despite each of them knowing that he was unable to take it himself due to his withdrawal symptoms, which had worsened since he was transferred into segregation in that he had also become agitated, a symptom indicative of both worsening delirium and Suboxone withdrawal. The extent of his agitation and worsening symptoms 3-hours after supposedly being given Klonopin demonstrated that his condition was worsening and required more substantial medical attention.

97.    During this 6:19 p.m. encounter, Courchesne again asked to be transferred to the hospital because something was "severely wrong." While he had made such a request to Dagesse and Kelsea during his transfer to Cellblock 307-A, this was the first-of-three encounters Olson had with Courchesne where such a request was made. This suggest that he was in particular distress during this encounter and in need of more substantial medical attention. When Courchesne did not

---

[5] The medication was not to treat his alcohol withdrawal or OUD, as it did not include a benzodiazepine or Suboxone (or other similar opioid therapy).

take his medication (as he was unable to do), Olson told him that if he would not take it, then they would not give it to him, and he would not be going to the hospital.

98.     When Courchesne did not take his medication, he was left unmedicated in his cell, supposedly because it was unsafe to enter. Yet, at 6:57 p.m., Dagesse, Kelsea and Purrington did just that and entered Cellblock 307-A to retrieve a book that Courchesne had been given, a task that was performed without incident and without any attempt to provide him the medication he was unable to take less than 40-minutes earlier. During this encounter, Courchesne again asked for medical attention and transfer to a hospital, which was refused. Those pleas continued even after those officers left his cell, yet those pleas for help were ignored.

99.     Courchesne was deliberately and knowingly given medication in a manner that rendered him unable to take it, leaving him unmedicated, suffering from Suboxone withdrawal and alcohol withdrawal delirium—which has a mortality rate of 37% when not treated appropriately and timely. The only purported reason he was not assisted in taking his medication was his agitated state, which did not prevent correctional officers from entering his cell for the immaterial purpose of retrieving a book. Even if he was agitated, this should have resulted in his transfer to a hospital setting—not the withholding of essential care.

100.     For the 2-hours after Dagesse, Kelsea and Purrington entered his cell (from 6:57 p.m. to 8:57 p.m.), prison personnel—including Dagesse, Kelsea, Purrington, Biron and Olson— could see and hear Courchesne "through the Inmate Monitoring System hitting his door and seemingly talking to people that were not there." They could also hear him begging to be taken to a hospital. Donavan Aubin ("Aubin")—who was in the cell adjacent to Courchesne—confirmed that Courchesne was hallucinating "a lot." He also confirmed that Courchesne begged for "medical attention." A summary of a statement Aubin gave states:

**Aubin** said he overheard **Courchesne** trying to communicate with the Correctional Officer in reference to requesting medical attention. **Aubin** added that **Courchesne** was denied medical attention every time **Courchesne** asked for it. [**Aubin**] further explained that on the night before **Courchesne** passed away, Correctional Officers came into **Courchesne's** cell and denied him medical attention . . .

**Aubin** then spoke about an incident he said occurred around lunch time. **Aubin** said **Courchesne** told Correctional Officer Kelsea that he needed medical attention, he needed to see a doctor and that they could handcuff him and bring him to the hospital. **Aubin** added they refused **Courchesne** medical attention . . .

\* \* \*

**Aubin** said that at approximately 1830 hours to 1900 hours, while the jail was doing laundry exchange, **Aubin** again requested medical attention, requested to see the nurse, and started calling out from his cell that he needed medical attention.

In addition, a Declaration of Donavan Aubin confirming the repeated request for medical attention made by Courchesne, all of which were denied, is annexed hereto as Exhibit D.

101.    Due to the refusal to provide Courchesne with essential medical care, his medical conditions (alcohol and Suboxone withdrawal) worsened and, after his pleas for medical attention were ignored, he was heard talking incoherently and debating with his hallucinations past 10:00 p.m. Benoit then entered Cellblock 307 to shut off the lights for the night. Courchesne begged him to go to the hospital and for him to not shut off the lights because someone he believed to see in his cell was going to kill him. In response, Benoit laughed and shut off the lights. Courchesne abruptly stopped speaking at lights out and never spoke again.

102.    At 12:27 p.m., Covey observed Courchesne on the floor of his cell, at which time he requested a welfare check, yet one was not performed until 12:40 a.m. When the welfare check was finally performed, Courchesne was found lying face down and the skin near his stomach was noted to be "purple in color." This sort of purple discoloration suggests that Courchesne had already been dead for up to 2-hours when he was finally checked at 12:40 a.m.[6] In stark contrast

---

[6] https://www.sciencedirect.com/topics/medicine-and-dentistry/livor-mortis#:~:text=It%20is%20first%20noticed%20as,pressed%20back%20into%20the%20capillaries. (last visited October 4, 2024).

to the continuous nursing observation in a well-lit environment required for persons experiencing alcohol withdrawal delirium, Courchesne was left unmonitored in darkness.

103.    An autopsy was performed by Mitchell Weinberg, MD, who identified acute ethanol withdrawal (delirium tremens) as the cause of death and stated as follows:

> . . . JOSEPH COURCHESNE, a 36-year-old Caucasian man, died as a result of acute ethanol withdrawal, which was a complication of the patient's underlying chronic ethanol abuse. Acute ethanol withdrawal, also known as delirium tremens (DTs), is the most severe form of alcohol withdrawal that can occur in persons who routinely consume ethanol to excess when there is an abrupt cessation (or even just a substantial decrease) of alcohol consumption. The clinical history in this case is classic for DTs, and DTs may prove fatal as a result of collapse of the central nervous and/or cardiovascular systems.

104.    Alcohol withdrawal delirium has less than a 1% mortality rate when appropriately and timely treated and, in this case, death was easily preventable since Courchesne was first known to be going through alcohol withdrawal and taking MAT for OUD before he experienced any signs of delirium. Confronted with clear, objective signs that his life-threatening medical condition was worsening during each of their encounters with Courchesne, Defendants each chose to effectively do nothing to mitigate the situation when they each knew or should have known that medical interventions, as basic as medication and transfer to a hospital setting, would have saved his life.

105.    Each Defendant knew or should have known from CCDOC records, including shift change reports, that Courchesne was suffering from two separate, but equally serious medical conditions: alcohol withdrawal and OUD. Each individual Defendant had multiple encounters with Courchesne and, during each of those encounters, they were each presented with clear, objective signs that his serious medical conditions were worsening, which suggested that he required more substantial medical attention than he was receiving, especially since his OUD was not being treated at all and, to the contrary, his existing treatment regimen had been abruptly discontinued.

**B.  Each Defendant Was Deliberately Indifferent**

106.    Confronted with clear, objective signs that the concomitant alcohol and Suboxone withdrawal Courchesne was suffering from was worsening during their respective encounters with him, each Defendant chose to effectively do nothing to mitigate the situation when they each knew or should have known that certain interventions (e.g., benzodiazepines, transfer to an emergency department or a hospital setting, intravenous administration of drugs and fluids, especially once he was unable to take oral medication without assistance, close nursing observation and supportive care, Suboxone) would have easily prevented the worsening of his symptoms and his death.

***Savannah Harrison, RN***

107.    Harrison had her first contact with Courchesne on October 1, 2022, at 7:40 a.m., at which time she noticed tremors in his hands and was advised that he used alcohol every day for the past 7-years. She also verified that he was prescribed Suboxone as part of a MAT program to treat his OUD. She then performed a CIWA and Courchesne scored a 22, which means that he was already suffering severe alcohol withdrawal. Based on the severity of his alcohol withdrawal, as evidenced by his CIWA score, immediate pharmacological intervention with a benzodiazepine was necessary to prevent the worsening of his already life-threatening condition:

> Patients experiencing severe alcohol withdrawal (e.g., CIWA-Ar scores $\geq$19) should receive pharmacotherapy. Benzodiazepines are first-line treatment.
> * * *
> Front loading is recommended for patients experiencing severe alcohol withdrawal (e.g., CIWA-Ar scores $\geq$19) . . .

ASAM Guidelines at p. 10; *see* DOJ Guidelines at p. 30 ("A-24. Benzodiazepines are the preferred agent for treating alcohol withdrawal . . . A-27. Patients with CIWA-Ar scores >10 and patients at risk of developing severe or complicated alcohol withdrawal should receive pharmacotherapy and supportive care."); BOP Guidelines at p. 7 ("**Benzodiazepines are the mainstay of alcohol**

**withdrawal treatment in the correctional setting**" and recommending lorazepam be given every hour in 2-4mg doses for inmates with CIWA scores >10) (emphasis in original).

108.    Further, given that he was taking Suboxone as part of a MAT program to treat his OUD, he not only required treatment with benzodiazepines, but also stabilization of his OUD with continued MAT in a hospital setting with the resources to manage the increased risk of respiratory depression and other complications associated with concomitant treatment for alcohol withdrawal and OUD. However, Harrison—in concert with Soucy—terminated his MAT and, in effect, denied him Suboxone that had been legally prescribed prior to his being detained at the CCDOC, knowing it would cause withdrawal symptoms and exacerbate his alcohol withdrawal.

109.    Knowing that Courchesne required stabilization of his OUD through continuation of his pre-existing opioid therapy (Suboxone) concomitantly with treating his alcohol withdrawal with benzodiazepines in a hospital setting, Harrison did not take any steps to provide such essential and necessary medical treatment and, instead, denied him Suboxone, without initiating opioid detoxification, knowing such an abrupt end to that necessary medical treatment would cause opioid withdrawal, while exacerbating his alcohol withdrawal, and allowed his transfer to Cellblock 306, where his life-threatening condition worsened from severe to delirium tremens.

110.    During her 10:00 a.m. encounter with Courchesne, Harrison noted that his "shaking was bothering him" and, during her 2:00 p.m. encounter, she noted that "the tremors were about the same," meaning there was no improvement. During these encounters, Harrison again delayed providing necessary medical treatment, without any medical reason and despite knowing that such a delay would exacerbate his condition.[7] She also failed to repeat a CIWA to assess whether his

---

[7] When severe alcohol withdrawal is not appropriately treated in a timely manner, it has an anticipated mortality rate of up to 37%, compared to a less than 1% mortality rate when treatment is timely initiated. Rahman A, Paul M. Delirium Tremens. [Updated 2023 Aug 14]. In: StatPearls [Internet]. Treasure Island (FL): StatPearls Publishing; 2024 Jan-. Available from: https://www.ncbi.nlm.nih.gov/books/NBK482134/#; BOP Guidelines at p. 5.

withdrawal was improving or, as it turned out, was worsening in severity, which emphasized the need for immediate administration of a benzodiazepine and transfer to a hospital.[8]

111.    By her next encounter at 6:00 p.m., Harrison was confronted with clear, objective signs that Courchesne required urgent medical care and transfer to an acute care facility or hospital were present: (1) his tremors persisted and "were getting worse," despite 3-doses of medication having been given; (2) he was hallucinating; (3) his existing medical condition was getting worse to the point he was unable to take medication without assistance; (4) he was in a hypertensive crisis with a tachycardia of 124; and (5) his CIWA score was 22 with complicated symptoms indicative of delirium and a significant comorbidity consisting of OUD.

112.    Faced with an inmate showing clear, objective signs of alcohol withdrawal delirium that was worsening and knowledge that timely administration of benzodiazepines, stabilization of his OUD, and management in a hospital setting were necessary to care for Courchesne and prevent his demise, Harrison chose to do very little and, in fact, withheld benzodiazepines and Suboxone, and left him with no medical oversight for ~16-hours until the next medication pass at 10:00 a.m. on October 2, 2024, all the while Courchesne suffered needlessly from worsening withdrawal symptoms consisting of severe body tremors, hallucinations, and profuse sweating.

113.    There was no medical reason to withhold such necessary treatment, and the failure of Harrison to provide it was an inexplicable breach of the standard of care and violation of the Alcohol Detox Policy, which states that a benzodiazepine (Ativan) "will be ordered" when inmates experience "hallucinations/restless OR (depending on severity)." Nevertheless, Harrison did not

---

[8] ASAM Guidelines at p. 43 ("In patients with moderate to severe withdrawal or those requiring pharmacotherapy, re-assess every 1 – 4 hours for 24 hours, as clinically indicated. Once stabilized (e.g., CIWA-Ar score < 10 for 24 hours), monitoring can be extended to every 4–8 hours for 24 hours, as clinically indicated."); DOJ Guidelines at p. 28 ("A clinical assessment including the CIWA-Ar should be conducted *at least* every 8 hours during alcohol withdrawal treatment until the CIWA-Ar score remains below 10 for 24 hours."); BOP Guidelines at p. 8 (recommending that the CIWA be repeated "in one hour" and then "every 4-8 hours until the score has remained less than 10 for 24 hours" for inmates with an initial CIWA >10).

treat Courchesne with a benzodiazepine, despite knowing that he was experiencing hallucinations, that he was suffering from the most severe form of alcohol withdrawal, and that not providing such necessary treatment would exacerbate his life-threatening condition.

114.    She also failed to keep his OUD stabilized by continuing his MAT with Suboxone that had been legally prescribed prior to his being detained at the CCDOC, knowing it would cause withdrawal symptoms and exacerbate his alcohol withdrawal. Moreover, when she terminated his MAT, she did not initiate opioid detoxification in violation of the CCDOC Opioid Detoxification Policy, which makes clear that Suboxone—which contains Buprenorphine—is an opioid and that hypertension, tachycardia and tremors—all of which Courchesne experienced during his encounter with Harrison on October 1, 2022—are symptoms of opioid withdrawal.

115.    The only medications Harrison administered consisted of a multivitamin, clonidine, thiamine, Bentyl, Ibuprofen, and hydroxyzine—none of which are treatments for either alcohol withdrawal or OUD. Instead, these so-called adjunctive medications are meant to be used together with benzodiazepines and opioid therapies to help manage withdrawal symptoms, but they do nothing to treat the underlying medical conditions (i.e., alcohol and opioid withdrawal) producing those symptoms. That is, at best, those medications provide symptomatic or palliative treatment, but do not treat the cause of the symptoms they manage.

116.    Harrison was fully aware that Courchesne required treatment with a benzodiazepine from the time of her initial encounter with him at 7:40 a.m. on October 1, 2022—as well as that due to his Suboxone use, he required continued MAT to stabilize his OUD concomitantly with treating his alcohol withdrawal in a hospital setting—yet she chose not to take any steps to provide him with such care and treatment and, instead, allowed his already-serious condition to worsen

during her encounters with him due to her inaction and kept a chronic alcoholic suffering from severe alcohol withdrawal and OUD in jail without medical supervision.

117.    Moreover, Harrison was well-aware that persons experiencing alcohol withdrawal delirium should be provided supportive care in a quiet, well-lit room with continuous monitoring of vital signs by nursing staff to avoid aggravating, exacerbating and worsening their withdrawal symptoms, yet acquiesced in him being detained in Cellblock 306 (i.e., general population), where the lights were shut off overnight and Courchesne had no continuous monitoring of vital signs by nursing staff, despite her actual knowledge that his condition was worsening and that he was not being given necessary medications.

118.    While Harrison may not have been authorized to issue a benzodiazepine, that does not negate her deliberate indifference. At a minimum, she should have told supervisory personnel about the care Courchesne was (or was not) receiving, including that his treatment did not comply with the Alcohol Detox Policy, she should have initiated a transfer to an emergency department or hospital, she should have called 911 given the severity of his alcohol withdrawal delirium, not to mention his hypertensive crisis and tachycardia, she should have provided medical supervision of Courchesne, but she did none of the foregoing.

119.    In sum, Harrison had actual knowledge that the serious medical conditions from which Courchesne was suffering had worsened during her encounters with him, that his demise was easily preventable through certain medical interventions, and that she failed to take steps that would have prevented that demise. Her limited care was so clearly inadequate compared to what is known to be required to prevent the death of a person suffering from alcohol withdrawal delirium and concomitant OUD that it amounts to a refusal to provide essential care. As stated in more detail above, Harrison did not provide any of the necessary care required by, *inter alia*:

(a) withholding necessary medical treatment (benzodiazepine, stabilization of OUD through continued Suboxone treatment, opioid detoxification, transfer to a hospital setting, continuous monitoring) during each encounter she had with Courchesne without any non-punitive medical reason, despite knowing that a delay of such treatment would exacerbate his medical conditions and increase his mortality rate more than 37-fold, which caused his condition to worsen, as evidenced by the severe body tremors, hallucinations, and profuse sweating from which he suffered following her last encounter; and

(b) denying him Suboxone that had been legally prescribed prior to his detainment at the CCDOC as part of a MAT program for his OUD, without any non-punitive medical reason for denying him such necessary medical treatment and without initiating any opioid detoxification, despite knowing that the abrupt termination of his Suboxone was exacerbating his alcohol withdrawal and causing opioid withdrawal, which caused him to suffer opioid withdrawal until the time of his death concomitantly with his alcohol withdrawal, as evidenced by his hypertension, tachycardia and tremors; and

(c) keeping a chronic alcoholic in a jail setting without appropriate and necessary medical supervision, when she knew that he was suffering from the most severe form of alcohol withdrawal, which was further complicated and worsened by his concomitant OUD for which treatment had been abruptly terminated upon his detainment at the CCDOC, especially after his condition worsened from severe alcohol withdrawal to alcohol withdrawal delirium by no later than 6:00 p.m. on October 1, 2022.

120.    Instead, confronted with clear, objective signs that his already-serious medical condition was worsening during her encounters with Courchesne, Harrison chose to effectively do nothing to mitigate the situation when she knew or should have known that certain interventions would have improved his condition, yet were not provided. By 6:00 p.m. on October 1, 2022, she knew the limited care she provided was ineffective, and that in spite of her limited, inadequate care, Courchesne was continuing to suffer, his condition was continuing to worsen, and he was not given the medications she knew was needed to prevent his demise.

**David Olson, RN**

121.    Olson had his first encounter with Courchesne on October 2, 2022, at 10:00 a.m., prior to which he was made aware of that treatment of his OUD with Suboxone had been abruptly

terminated upon his detainment, and that since his arrival to CCDOC, his withdrawal had worsened from severe to delirium, despite the adjunctive medication given by Harrison. During that 10:00 a.m. encounter, Courchesne told Olson that he was hallucinating, and like Harrison, Olson did not take any steps to initiate necessary medical treatment necessitated by the withdrawal delirium from which Courchesne was suffering.

122.    Instead, Olson continued Courchesne on the same adjunctive medications he had been taking since 7:40 a.m. on October 1, 2022, knowing that: those medications had not improved his condition; those medications do not treat and are not treatments for either alcohol or Suboxone withdrawal, or OUD; and his condition had continually worsened on those medications. Knowing Courchesne required stabilization of his OUD through continuation of his MAT with Suboxone concomitantly with treating his alcohol withdrawal with benzodiazepines in a hospital, Olson did not take any steps to provide such essential and necessary medical treatment.

123.    There was no medical reason for Olson failing to provide such necessary medical treatment. In fact, his failure to administer benzodiazepines to a hallucinating inmate suffering from delirium violated the Alcohol Detox Policy; his failure to initiate opioid detoxification for an inmate exhibiting symptoms of opioid withdrawal (tremors, hypertension, tachycardia) violated the Opioid Detoxification Policy; and his failure to provide the foregoing treatment concurrently with initiating a transfer to a hospital for an inmate in need emergent need of medical care fell so bar below the standard of care that it amounted to a refusal to provide essential care.

124.    Olson knew that the adjunctive treatments were so inadequate compared to what is known to be required to prevent the death of a person suffering from delirium, especially when complicated by concomitant OUD and Suboxone withdrawal, that his refusal to alter that treatment amounted to a refusal to provide essential care, as demonstrated by the worsening of the symptoms

Courchesne suffered after those mediations were initiated. He knew there was no medical reason to delay the necessary treatment identified above, yet that is exactly what he did during the 10:00 a.m. encounter, knowing that any further delay would exacerbate his life-threating condition and significantly increase his mortality rate.

125.    Olson displayed the same deliberate indifference during his next encounter with Courchesne on October 2, 2022, at 2:17 p.m., at which time Courchesne had tremors, which were observed to be so severe that Olson had to assist him "in taking his [adjunctive] medication due to his uncontrollable shaking." Olson again failed to initiate the necessary medical treatment required by the standard of care, the Alcohol Detox Policy and the Opioid Detoxification Policy, without any medical reason for failing to initiate such treatment. He also failed to perform a repeat CIWA, despite one not having been done for over 30-hours by this point in time.

126.    At 3:09 p.m., Olson was informed that Courchesne was feeling worse and that his hallucinations had worsened. At 3:17 p.m., Olson claims to have given Courchesne a Klonopin (also known as Clonazepam), a benzodiazepine. There are several deficiencies with this treatment that rendered it so clearly inadequate compared to what is known to be required that it amounted to a refusal to provide essential care. First, toxicology screening of a blood sample collected less than 24-hours after Klonopin was supposedly given indicate that Courchesne was not actually given Klonopin, as there were no benzodiazepines in his system.[9]

127.    Second, even if he had been given a benzodiazepine, Olson did nothing to stabilize his OUD and Suboxone withdrawal, leaving those medical conditions entirely untreated, which means his withdrawal would have persisted and Courchesne would have continued suffering from the symptoms of his Suboxone withdrawal, particularly tremors, hypertension, and tachycardia,

---

[9] Had Courchesne been given Klonopin, it should have been detected in his femoral blood that was collected less than 24-hours later given its half-life of 30-40 hours.

among others. That is, even if his alcohol withdrawal was treated with a benzodiazepine, Olson did nothing to treat his OUD or Suboxone withdrawal, while continuing to deny him Suboxone that had been prescribed prior to his being detained at the CCDOC.

128.    <u>Third</u>, during the 3:17 p.m. encounter, the tremors and shaking Courchesne had been experiencing worsened to the point that he "was unable to take the medication himself," yet Olson did not arrange for intravenous access for administration of benzodiazepines or transfer to a hospital setting, as was necessary and required by the standard of care. The BOP Guidelines state: "All patients with seizures or delirium tremens should be given IV benzodiazepines. IV administration should only be considered in the hospital/inpatient setting." BOP Guidelines at p. 7. This is confirmed by the ASAM Guidelines, which state:

> Provide immediate intravenous access for administration of drugs and fluids to patients experiencing alcohol withdrawal delirium . . . Patients with alcohol withdrawal delirium should be sedated to achieve and maintain a light somnolence. Benzodiazepines are recommended as the first-line agents for managing alcohol withdrawal delirium.

ASAM Guidelines at pp. 51–52.

129.    The need for intravenous access is established by the tremors Courchesne exhibited during this encounter, which had worsened to the extent that Olson had to pour the medication into his mouth because he was "unable to take the medication himself." This was a new objective sign that Courchesne was deteriorating since he had not been unable to take medication himself at any time prior to October 2, 2022, at 3:17 p.m. Had Olson arranged for intravenous administration of benzodiazepines, his inability to take medication would have been overcome and he would have been given the medication necessary to prevent his condition from worsening.

130.    <u>Finally</u>, the dosage and frequency of Klonopin was so clearly inadequate compared to what was required that—even assuming it was given to and taken by Courchesne—it would not

have improved his condition or prevented his condition from continuing to worsen, and effectively amounted to no treatment at all. The Klonopin order stated that Courchesne was to be given 1-mg during the 3:17 p.m. encounter, but not given another dose until the morning of October 3, 2022. This not only breaches the standard of care, but violates the Alcohol Detox Policy, which requires 1-mg of benzodiazepine be given three-times a day ("TID").

131.    The clear inadequacy of the dosage and frequency ordered is apparent when it is compared to what is required. For example, the ASAM Guidelines provide the medication regimen required to treat severe alcohol withdrawal.[10] The chart is depicted below and shows that a single 1-mg dose of Klonopin—with the next 1-mg dose to be provided 19-hours later (i.e., at the 10:00 a.m. med-pass the next morning) is so woefully inadequate to treat severe alcohol withdrawal that even if it was given at 3:17 p.m. on October 2, 2022, giving it at that dose without any more to be given for 19-hours amounted to a failure and refusal to provide essential care:

| Medication | Regimen | Description, Examples |
|---|---|---|
| Benzodiazepines *(doses in Chlordiazepoxide)* | Typical single dose | Mild withdrawal (CIWA-Ar < 10): 25–50 mg PO |
| | | Moderate withdrawal (CIWA-Ar 10–18): 50–100 mg PO |
| | | Severe withdrawal (CIWA-Ar ≥19): 75–100 mg PO |
| | Symptom-triggered | 25–100 mg PO q4–6h when CIWA-Ar ≥10. Additional doses PRN. |
| | Fixed-dose | Taper daily total dose by 25–50% per day over 3–5 days by reducing the dose amount and/or dose frequency. Additional doses PRN. |
| | | Day 1: 25–100 mg PO q4–6h |
| | | Day 2: 25–100 mg PO q6–8h |
| | | Day 3: 25–100 mg PO q8–12h |
| | | Day 4: 25–100 mg PO at bedtime |
| | | (Optional) Day 5: 25 to 100 mg PO at bedtime |
| | Front loading | *Symptom-triggered:* 50–100 mg PO q1–2h until CIWA-Ar < 10. |
| | | *Fixed-dose:* 50–100 mg PO q1-2h for 3 doses. |

ASAM Guidelines at p. 70; *see* BOP Guidelines at p. 8 (recommending administration of 2-4-mg of Lorazepam (which is equivalent to 1-2-mg of Klonopin) every 60-90-minutes until CIWA score is <10 for inmates with an initial CWIA score of 10-15 and, for inmates with an score >15, states:

---

[10] The chart states the dosage in Chlordiazepoxide (Librium). A 20-mg dose of Chlordiazepoxide converts to a 1-mg dose of Clonazepam (Klonopin) so, for example, a 50-mg dose of Chlordiazepoxide is the equivalent of a 2.5-mg dose of Clonazepam and a 100-mg dose of Chlordiazepoxide is the equivalent of a 5-mg dose of Clonazepam.

"Lorazepam can be given up to 2-4 mg IV, as frequently as every 15-20 minutes," as an "increase of [] lorazepam . . . may be indicated.").

132.    The ASAM Guidelines state the regime for three different methods of administering benzodiazepines: single dose, symptom-triggered fixed-dose and front loading. Since Courchesne had a CIWA ≥19, front loading should have been the method chosen for Courchesne (ASAM Guidelines at p. 10) and, pursuant to that dosing method, he should have been treated with 2.5-5-mg of Klonopin every 1-2-hours until his CIWA was <10. Even if Olson chose to treat Courchesne with a single dose, as he did, the minimum dose required was 3.8-5-mg of Klonopin (i.e., 4-5 times more than the dose he supposedly gave).

133.    Assuming Courchesne had been given 1-mg of Klonopin at 3:17 p.m. on October 2, 2022, that he died ~12-hours later (and, as a result, stopped actively metabolizing the drugs and medications in his system) and no benzodiazepines were found in his system when a femoral blood sample taken less than 24-hours later was analyzed further highlights the inadequacy of the dosage and frequency of the benzodiazepines supposedly administered. If there were no benzodiazepines in his system, clearly the dosage and frequency were so inadequate that he was not receiving any benefit from that medication at the time of his death, even assuming it was given.

134.    In sum, the toxicology results indicate that Courchesne was never treated with a benzodiazepine, but even if he had been, the method of administration, dosage and frequency were clearly inadequate compared to what was required to prevent the death of a person suffering from severe alcohol withdrawal that it amounted to a refusal to provide essential care. There was no medical reason for not providing a benzodiazepine in the required way, in the required dosage and at the required frequency—together with treatment to stabilize his OUD—and Olson knew that providing it the way he claims to have would exacerbate his life-threatening condition.

135.    Even after Klonopin was supposedly given, Courchesne's already-serious medical condition continued to worsen. Courchesne tied a pillowcase around his eyes and began to stumble around Cellblock 306 before laying on the floor around 3:40 p.m., he then reported that he had to tie the pillowcase around his eyes because "he kept seeing demons and devils everywhere" at 3:44 p.m., and Biron observed that Courchesne was "getting worse" by 4:42 p.m., despite Klonopin supposedly having been given over an hour earlier. Olson was aware of these developments, yet did not respond to Courchesne until 6:19 p.m.

136.    At 6:19 p.m., Olson observed Courchesne banging on his cell door, demanding medical attention and requesting transfer to a hospital. Not only did Olson refuse his request for transfer to a hospital, but he also only offered Courchesne his evening medication through the cell door chase, despite knowing from his last encounter with Courchesne that he was unable to take medication himself without assistance. When Courchesne did not take his medication, Olson told him that if he was not going to take his medication (which he was unable to do), then they would not give it to him, and he would not be going to the hospital.

137.    When Courchesne did not take his medication, Olson took no steps to ensure he received appropriate care—despite knowing his condition had worsened since his last encounter to the extent that he had to be transferred to segregation—by, for example, assisting him in taking the medication (like he claimed to have done earlier), transferring him to an emergency department or hospital where the medication could be given intravenously, contacting supervisory personnel, calling 911 or taking other steps to ensure that Courchesne had access to medication to treat his serious, lift-threatening conditions that were continuing to worsen.[11]

---

[11] The DOJ Guidelines specifically address situations where treating an inmate becomes complicated by agitation, stating that such inmates "should be transferred to a hospital," where they can be appropriately managed.

138.    Instead, Olson told Courchesne, who was in a state of delirium and suffering from hallucinations, agitation, confusion and tremors, that if he did not voluntarily take his medication on his own without assistance—which Olson knew he was physically and mentally unable to do given his alcohol withdrawal delirium and based on his prior encounter with Courchesne—then he would be left in his cell without medication and would not be hospitalized, despite Olson knowing that untreated alcohol withdrawal delirium is a fatal condition, requiring timely and proper medical attention and treatment, especially when concomitant with OUD and Suboxone withdrawal.

139.    Courchesne could not refuse medication considering he was in a state of delirium and believed that the devil and demons were in his cell trying to drag him down to hell (i.e., he lacked sufficient mental capacity). That is, Olson knew that: (a) alcohol withdrawal delirium was fatal if not appropriately treated, (b) Courchesne was not in a position to make informed medical decisions, and (c) his death should have been easily prevented by sending him to an emergency department or hospital equipped to managed complicated alcohol withdrawal, yet he failed to take steps to prevent that harm and, in fact, did not even check his vitals.

140.    Further, Olson had at least 3-encounters with Courchesne before he made his first request to be taken to a hospital. That Courchesne did not request to be hospitalized during those 3-encounters, suggests that he was in particular distress and in need of more substantial medical attention during his October 2, 2022 encounter with Olson at 6:19 p.m. Faced with an inmate showing visible signs of alcohol withdrawal delirium and requesting hospitalization to alleviate his symptoms, Olson did nothing to mitigate the situation and, instead, denied his repeated requests for medical attention, withheld essential medications, and left him alone in his cell.

141.    In sum, Olson had actual knowledge that the serious medical conditions from which Courchesne was suffering had worsened during his encounters with him, that his demise was easily

preventable through certain medical interventions, and that he failed to take steps that would have prevented that demise. His limited care was so clearly inadequate compared to what is known to be required to prevent the death of a person suffering from alcohol withdrawal delirium and concomitant OUD that it amounts to a refusal to provide essential care. As stated in more detail above, Olson did not provide any of the necessary care required by, *inter alia*:

(a) withholding necessary medical treatment (benzodiazepine, stabilization of OUD through continued Suboxone treatment, opioid detoxification, transfer to a hospital setting, continuous monitoring) during his 10:00 a.m. and 2:17 p.m. encounters without any medical reason, despite knowing a delay of such treatment would exacerbate his life-threatening condition and increase his mortality rate, which caused his condition to objectively worsen, as evidenced by the worsening of his hallucinations and tremors that rendered him unable to take medication on his own without assistance;

(b) withholding necessary medical treatment (benzodiazepine, stabilization of OUD through continued Suboxone treatment, opioid detoxification, transfer to a hospital setting, continuous monitoring) during his 3:17 p.m. encounter without any medical reason, despite knowing a delay of such treatment would exacerbate his life-threatening condition and increase his mortality rate, which caused his condition to worsen, as evidenced by the need to transfer him to segregation, the confusion he exhibited while be transferred (i.e., he told the correctional officers that his friend was coming to pick him up to go to the doctor), and the aggravation he developed that led to Olson deeming it unsafe to enter his cell during his 6:19 p.m. encounter;

(c) delaying necessary medical treatment in the form of benzodiazepines by more than 5-hours (from October 2, 2022, at 10:00 a.m., to October 2, 2022, at 3:17 p.m.) without any non-punitive medical reason for delaying such treatment, despite knowing that delaying such treatment would exacerbate his condition, which caused his life-threatening condition to worsen, as evidenced by the worsening of his withdrawal symptoms;

(d) denying him Suboxone that had been legally prescribed prior to his detainment at the CCDOC as part of a MAT program for his OUD, without any non-punitive medical reason for denying him such necessary medical treatment and without initiating any opioid detoxification, despite knowing that the abrupt termination of his Suboxone was exacerbating his alcohol withdrawal and causing opioid withdrawal, which caused him to suffer opioid withdrawal until the time of his death concomitantly with his alcohol withdrawal, as evidenced by his hypertension, tachycardia and tremors; and

(e) keeping a chronic alcoholic in a jail setting without appropriate and necessary medical supervision, when he knew that he was suffering from the most severe form of alcohol withdrawal, together with OUD and Suboxone withdrawal, especially after his condition worsened to the point that he had to be transferred to segregation, and he did not take his medication during the 6:19 p.m. encounter, which Olson knew or should have known would exacerbate his life-threatening condition and increase his mortality rate.

142.    Instead, confronted with clear, objective signs that his already-serious medical condition was worsening during his encounters with Courchesne, Olson chose to effectively do nothing to mitigate the situation when he knew or should have known that certain interventions would have improved his condition, yet were not provided. In fact, Olson aggravated and worsened his serious medical condition by withholding medication from Courchesne on October 2, 2022, at 6:19 p.m.—which was when the last dose of medications was supposed to be administered before Courchesne died in his cell hours later of acute alcohol withdrawal.

143.    Olson not only had knowledge of an impending harm, but also engaged in conduct that accelerated it by withholding essential medication. While he offered the medication through the cell door, Olson knew Courchesne was unable to take medication without assistance from his prior encounter, during which he had to pour medication into his mouth because of his inability to take it himself "due to his uncontrollable shaking." Olson knew or should have known that leaving Courchesne in his cell without medication was likely to result in a death that would have easily been prevented by transferring Courchesne to an emergency department or hospital.

***Robert Soucy, DO***

144.    On October 1, 2022, at about 7:40 a.m., Harrison informed Soucy that Courchesne was a chronic alcoholic suffering from severe alcohol withdrawal with a CIWA of 22. She made him aware of the other information she obtained during her 7:40 a.m. encounter, including that Courchesne was experiencing tremors, and was prescribed Suboxone as part of a MAT program

for his OUD. Knowing Courchesne required stabilization of his OUD with continued Suboxone treatment concomitantly with a benzodiazepine and transfer to a hospital, Soucy—in concert with Harrison—terminated his MAT and left his OUD and alcohol withdrawal untreated.

145.    Knowing that Courchesne required stabilization of his OUD through continuation of his pre-existing opioid therapy, Suboxone, concomitantly with treating his alcohol withdrawal with benzodiazepines in a hospital setting, Soucy did not take any steps to provide such essential and necessary medical treatment and, instead, denied him Suboxone, without initiating opioid detoxification, knowing such an abrupt end to that necessary medical treatment would cause opioid withdrawal, while exacerbating his alcohol withdrawal. This not only breached the standard of care, but also violated the Alcohol Detox Policy and Opioid Detoxification Policy.

146.    The only medications that Soucy ordered consisted of a multivitamin, clonidine, thiamine, Bentyl, Ibuprofen, and hydroxyzine—none of which are treatments for either alcohol withdrawal or OUD. Instead, these so-called adjunctive medications are meant to be used together with benzodiazepines and opioid therapies to help manage withdrawal symptoms, but they do nothing to treat the underlying medical conditions (i.e., alcohol and opioid withdrawal) producing those symptoms. That is, at best, those medications provide symptomatic or palliative treatment, but do not treat the cause of the symptoms they manage.

147.    The limited adjunctive medications are not treatments for and do not treat alcohol or Suboxone withdrawal, or OUD. Ordering these limited medications without also stabilizing his OUD by continuing Suboxone or another similar opioid therapy and ordering a benzodiazepine— the mainstay of alcohol withdrawal treatment in the correctional setting—amounted to a complete lack of treatment for the severe alcohol withdrawal, Suboxone withdrawal and OUD from which

Courchesne was suffering. There was no medical reason for not ordering these necessary medical treatments and transferring Courchesne to a hospital setting.

148.    As Soucy knew or should have known would result from such a lack of necessary medical treatment, the alcohol withdrawal from which Courchesne was suffering worsened to the point that he was suffering from alcohol withdrawal delirium by 6:00 p.m. At or about 6:25 p.m., Harrison informed Soucy that Courchesne was hallucinating and in a hypertensive crisis with a tachycardia of 124. Despite knowing withdrawal delirium is often fatal if not timely treated with benzodiazepines, Soucy delayed providing Courchesne with benzodiazepines until the following day, without any medical reason for delaying such necessary treatment.

149.    In fact, Soucy stated that he would only start a benzodiazepine "if the hallucinations continue tomorrow." This not only breached the standard of care, but violated the Alcohol Detox Policy, which states that benzodiazepines "will be ordered" for inmates who are hallucinating as a result of their alcohol withdrawal. There was no medical reason to delay benzodiazepines once Courchesne began to hallucinate, as that established that the existing medication regimen was inadequate, that he was not responding to that regimen, and that he required transfer to a hospital for emergent administration of benzodiazepines and OUD stabilization.

150.    Faced with an inmate showing clear, objective signs of alcohol withdrawal delirium that was worsening on the inadequate treatment initiated at 7:40 a.m. and knowledge that timely administration of benzodiazepines, OUD stabilization, and management in a hospital setting were necessary, Soucy withheld both Suboxone and benzodiazepines—the medications he knew were necessary to prevent further worsening of his condition and ultimately death—and left him with no medical oversight for approximately 16-hours until the next medication pass at 10:00 a.m. on October 2, 2024, all the while Courchesne suffered needlessly.

151.    There was no medical reason to withhold such necessary treatment, and the failure of Soucy to order it was an inexplicable breach of the standard of care and violation of the Alcohol Detox Policy. There is no non-punitive reason for Soucy to have withheld such treatment, since he knew Courchesne was suffering from the most severe form of alcohol withdrawal, his MAT for his OUD was discontinued, resulting in Suboxone withdrawals, as evidenced by his hypertension, tachycardia and tremors, and that not providing such necessary treatment would exacerbate his life-threatening condition and make it significantly more challenging to treat later.

152.    Soucy was fully aware that Courchesne required stabilization of his OUD with an opioid therapy, such as Suboxone, concomitantly with treatment for his alcohol withdrawal in the form of a benzodiazepine and transfer to a hospital setting from the time he was first notified of his condition at 7:40 a.m. on October 1, 2022, yet he chose not to take any steps to provide him with such care and treatment and, instead, allowed his already-serious condition to worsen due to his inaction and kept a chronic alcoholic suffering from severe alcohol withdrawal in jail without medical supervision or treatment for his serious medical conditions.

153.    Moreover, Soucy was well-aware that persons experiencing alcohol withdrawal delirium should be provided supportive care in a quiet, well-lit room with continuous monitoring of vital signs by nursing staff to avoid aggravating, exacerbating and worsening their withdrawal symptoms, yet acquiesced in him being detained in Cellblock 306 (i.e., general population), where the lights were shut off overnight and Courchesne had no continuous monitoring of vital signs by nursing staff, despite his actual knowledge that his condition was worsening and that he was not being given necessary medication.

154.    When Courchesne again reported that he was hallucinating during the 10:00 a.m. medication pass on October 2, 2022, Soucy failed to order a benzodiazepine, despite previously

saying that he would order one if his hallucinations continued on October 2, 2022. He also failed to transfer him to a hospital setting, stabilize his OUD, ensure he was receiving appropriate medical monitoring, and order a repeat CIWA to assess the severity of the withdrawal Courchesne was experiencing. Those failures persisted through the 2:17 p.m. medication pass and, as Soucy knew or should have known would result, Courchesne experienced worsening symptoms.

155.    While Soucy supposedly ordered Klonopin be given around 3:00 p.m. on October 2, 2022, there were numerous inadequacies with the order that rendered it so clearly inadequate that it amounted to a refusal to provide essential care. First, toxicology indicates that Klonopin was not given, as no benzodiazepines were in his system. Second, Soucy did nothing to stabilize his OUD and Suboxone withdrawal, leaving those conditions untreated. Third, Soucy failed to order intravenous access for administration of benzodiazepines, as was required. Finally, the dosage and frequency of the Klonopin ordered was so inadequate it amounted to no treatment at all.

156.    The inadequacy of the treatment ordered by Soucy is demonstrated by the continued worsening of Courchesne and his condition after the last dosage of medication provided before his death was given no later than 3:17 p.m. For example, Courchesne tied a pillowcase around his eyes and began to stumble around Cellblock 306 before laying on the floor around 3:40 p.m., he reported that "he kept seeing demons and devils everywhere" at 3:44 p.m., and Biron observed him "getting worse" by 4:42 p.m., resulting in his transfer to segregation. This was clear, objective evidence that Courchesne was not responding to the ordered treatment.

157.    Soucy was informed that Courchesne had to be transferred to segregation due to the worsening of his withdrawal delirium, that he was not given and did not take his medication during medication pass at 6:19 p.m., and that his vitals were not checked during the 6:19 p.m. medication pass in violation of the Alcohol Detox Policy. Despite knowing his condition would

be exacerbated to the point that it would be fatal if he was not immediately given benzodiazepines and transferred to a hospital or emergency department, Soucy took no steps to ensure Courchesne received the medical treatment necessary to prevent his death.

158.    Faced with an inmate showing clear, objective signs of alcohol withdrawal delirium that was complicated by concomitant OUD and Suboxone withdrawal, and continuously worsened on the inadequate treatment provided and knowledge that administration of benzodiazepines and management in a hospital setting were necessary to prevent the death of Courchesne, Soucy took <u>no</u> further action and kept a chronic alcoholic suffering from severe alcohol withdrawal delirium in jail and unmedicated without medical supervision from the time the 6:19 p.m. encounter with Olson ended up to when he was found dead in his cell at 12:40 a.m. on October 3, 2022.

159.    In sum, Soucy had actual knowledge that the serious medical conditions from which Courchesne was suffering continuously worsened on the limited medical treatment he ordered and continued to worsen after the last dosage was given, and that his demise was easily preventable through certain medical interventions, yet he failed to take steps that would have prevented that demise. His limited care was so clearly inadequate compared to what is known to be required to prevent the death of a person suffering from withdrawal delirium that it amounted to a refusal to provide essential care. In fact, he never even examined or met Courchesne.

160.    Moreover, both Harrison and Olson were acting in concert with Soucy, so the ways in which their care exhibited a deliberate indifference to the serious medical needs of Courchesne are applicable to Soucy, who was the CCDOC Medical Director in October 2022 and ultimately responsible for all medical treatment provided at CCDOC. As stated in more detail above, Soucy did not provide any of the necessary care required by, *inter alia*:

> (a) withholding necessary medical treatment (benzodiazepine, stabilization of OUD through continued Suboxone treatment, opioid detoxification, transfer to

a hospital setting, continuous monitoring) on October 1, 2022, at or about 7:40 a.m., when he was informed Courchesne was suffering from severe alcohol withdrawal, despite knowing that there was no medical reason to withhold such treatment and that delaying such treatment would exacerbate his condition and increase his mortality rate, which caused his condition to worsen, as evidenced by the worsening of his withdrawal from severe to complicated due to the development of alcohol withdrawal delirium;

(b) withholding necessary medical treatment (benzodiazepine, stabilization of OUD through continued Suboxone treatment, opioid detoxification, transfer to a hospital setting, continuous monitoring) on October 1, 2022, at or about 6:00 p.m., when he was informed Courchesne was suffering from withdrawal delirium, despite knowing that there was no medical reason to withhold such treatment and that delaying such treatment would exacerbate his condition, which caused him to suffer severe body tremors, hallucinations, and profuse sweating from that time through the following day, and caused his condition to worsen, as evidenced by the worsening of his hallucinations and his inability to take medication without assistance due to his uncontrollable tremors on October 2, 2022;

(c) delaying necessary medical treatment in the form of benzodiazepines by nearly 32-hours (from October 1, 2022, at 7:40 a.m., to October 2, 2022, at 3:17 p.m.) without any non-punitive medical reason for delaying such treatment, despite knowing that delaying such treatment would exacerbate his condition, which caused his life-threatening condition to worsen, as evidenced by the worsening of his alcohol withdrawal severity from severe to complicated with symptoms indicative of alcohol withdrawal delirium, e.g., hallucinations, and the objective worsening of his tremors, which worsened from hand tremors observed at 7:40 a.m. on October 1, 2022 to uncontrollable shaking that rendered him unable to take medication without assistance by 3:17 p.m. on October 2, 2022;

(d) denying him Suboxone that had been legally prescribed prior to his detainment at the CCDOC as part of a MAT program for his OUD, without any non-punitive medical reason for denying him such necessary medical treatment and without initiating any opioid detoxification, despite knowing that this abrupt termination of his Suboxone use would exacerbate his alcohol withdrawal and result in opioid withdrawal, which caused him to suffer opioid withdrawal concomitantly with his alcohol withdrawal, as evidenced by his hypertension, tachycardia and tremors; and

(e) keeping a chronic alcoholic in a jail setting without appropriate and necessary medical supervision, when he knew that he was suffering from the most severe form of alcohol withdrawal, especially after his condition worsened to the point that he had to be transferred to segregation, and he did not take his medication during the 6:19 p.m. medication pass, which Soucy knew or should have known would exacerbate his life-threatening condition and ultimate prove fatal.

161.    Instead, confronted with clear, objective signs that his life-threatening medical conditions were continually worsening without improvement, Soucy did nothing to mitigate the situation when he knew or should have known that certain interventions would have improved his condition, yet were not provided. By 6:19 p.m., Soucy knew that the limited care Courchesne had been provided proved ineffective, as his condition continued to objectively worsen after the last dosage was given, and that his condition would likely be fatal since he was being left unmedicated, without medical supervision, and without the necessary medical care, yet he did nothing.

***James Dagesse***

162.    Dagesse had his first contact with Courchesne at 10:00 a.m. on October 1, 2022, at which time Courchesne told him that he was a severe alcoholic, drinking a bottle of vodka per day for the last seven years. Dagesse noticed that Courchesne was shaking and already showing signs of alcohol withdrawal, which he recognized as signs of alcohol withdrawal because he observed those signs on several prior occasions with other inmates. He had two subsequent encounters with Courchesne on October 1, 2022, the latter of which was at 2:00 p.m. during med pass when he was having tremors that were bothering him.

163.    On October 2, 2022, at 10:00 a.m., Dagesse had an encounter with Courchesne, prior to which he was made aware of the status and progression of his alcohol withdrawal and general condition since his last encounter with Courchesne. During the 10:00 a.m. encounter on October 2, 2022, Courchesne told Dagesse that he was hallucinating—which was a symptom of alcohol withdrawal delirium not exhibited by Courchesne during his last encounter with Dagesse on October 1, 2022. This was a clear, objective sign that his already-serious medical condition had worsened since his last encounter with Dagesse.

164.    Dagesse next encountered Courchesne at 2:17 p.m., at which time Courchesne was still hallucinating, in response to which Courchesne was told to tap on the camera if he started to feel worse. By this time, Dagesse knew or should have known that Courchesne was not receiving the treatment required by the Alcohol Detox Policy (a benzodiazepine), and that the treatment he had been receiving since 7:40 a.m. on October 1, 2022 was ineffective and not improving his life-threatening condition, which had worsened from severe to complicated with the onset of symptoms indicative of alcohol withdrawal delirium.

165.    At 3:09 p.m., Courchesne tapped on the camera, in response to which Dagesse asked the reason for him tapping. Courchesne told Dagesse he was feeling worse and, at 3:17 p.m., Dagesse entered Cellblock 306 to see Courchesne, at which time he was supposedly given a dose of Klonopin. Dagesse claims to have observed Olson pour the Klonopin into his mouth because his tremors had progressed from his hands to his entire body, rendering him unable to take it himself.[12] From his initial encounter with Courchesne on October 1, 2022, Dagesse had observed first-hand his withdrawal symptoms worsen from hand tremors into delirium.

166.    Dagesse observed first-hand that Courchesne was not responding to the inadequate care he was provided. Dagesse knew that Courchesne tied a pillowcase around his eyes and began to stumble around Cellblock 306 before laying on the floor around 3:40 p.m., he stated that he had to tie the pillowcase around his eyes because "he kept seeing demons and devils everywhere" at 3:44 p.m., and that Courchesne was "getting worse" by 4:42 p.m., despite Klonopin having been

---

[12] As stated above, toxicology screening done on October 3, 2022, indicates that Courchesne was not actually given a benzodiazepine, as none was found in his system. However, Dagesse stating that Courchesne was unable to take his medication without assistance shows that: (a) he had actual knowledge that his condition was worsening, and (b) he was unable to take the medication supposedly offered to him later at 6:19 p.m. in the manner provided (i.e., through the cell door without assistance).

supposedly given more than an hour earlier. Dagesse was aware that Courchesne required further medical attention, as evidenced by his preparation of a "segregation cell", stating:

> At 1544 . . . I prepared a segregation cell so that Inmate Courchesne could be moved to a secure area for observation due to his worsening condition . . . Inmate Courchesne pleaded not to be placed in observation, claiming that the lack of a TV and phone would worsen his condition.

167.    However, at 4:42 p.m., Courchesne was seen walking behind the bunks in Cellblock 306, so Dagesse and Kelsea transferred him to segregation in Cellblock 307-A, despite both having been told that transferring him to that cell "would worsen his condition." During the transfer to the segregation cell, Courchesne exhibited signs of severe confusion by stating that his friend "would be here to pick him up momentarily for a doctor appointment" that "he couldn't miss." Based on his alcohol withdrawal delirium and severe confusion, Dagesse and Kelsea knew or should have known that Courchesne was continuing to deteriorate.

168.    While Dagesse and Kelsea were transferring him to Cellblock 307-A, Courchesne made his first request for medical attention and transfer to the hospital. Since Courchesne had not requested medical attention or transfer to a hospital during his prior encounters with Dagesse, this suggested or should have suggested to Dagesse that his medical condition was worsening and that he was in particular distress during this encounter. Dagesse denied his request for medical attention and transfer to a hospital and, instead, left him alone in his cell, wearing nothing but an anti-suicide smock, begging for medical attention and his clothes back.

169.    By 6:19 p.m., Dagesse observed Courchesne banging on his cell door, demanding medical attention and requesting transfer to a hospital. Not only was his request for transfer to a hospital refused, due to his agitation (a symptom of alcohol withdrawal delirium), he was only offered his medication through the cell door, despite Dagesse knowing from his last encounter with Courchesne that he was unable to take medication himself, that he required assistance to take

any medication (i.e., Olson had to pour it into his mouth) and that his condition had since worsened in that Courchesne was now also severely confused and agitated.

170.    When Courchesne did not take his medication, Dagesse did not take any steps to ensure he received appropriate care and treatment by, for example, arranging for or requesting a transfer to a hospital, contacting supervisory personnel, calling 911 or taking other steps to ensure that Courchesne had access to medication to treat his serious, life-threatening condition. The only purported reason for not entering his cell to assist him in taking his medication was his "agitated state," a symptom of the condition needing treatment that developed due to prior failures to provide necessary treatment, which is not an excuse to refuse necessary medical care and is an excuse that is undermined by subsequent interactions with Courchesne.

171.    For example, Dagesse entered Cellblock 307-A to retrieve pages from the book Courchesne had been given at 6:57 p.m.—less than 40-minutes after Dagesse, Kelsea and Olson refused to enter his cell to check his vitals and assist him in taking medication they knew he was unable to take without their assistance. While in his cell, Courchesne cooperated with their request to turn over the book, yet no attempt was made to check his vitals or give him the medication he was unable to take less than 40-minutes earlier. That Dagesse entered his cell to get a book, but not to provide him essential medical care, demonstrates his deliberate indifference.

172.    Dagesse knew that: (1) Courchesne was a severe alcoholic; (2) he was exhibiting signs of alcohol withdrawal as early as October 1, 2022, at 10:00 a.m.; (3) his alcohol withdrawal worsened over the course of his subsequent encounters with Courchesne until he was in a state of delirium that continued to get worse; and (4) his vital signs were not checked and he was not given his medication on October 2, 2022, at 6:19 p.m. (the last dose he should have received before he

died), in a way he could have taken it given he was and remained unable to take medication without assistance, which amounts to withholding essential treatment for non-medical reasons.

173.    Further, Dagesse had approximately 7-encounters with Courchesne before he made his first request to be taken to a hospital for medical attention. That Courchesne did not request to be hospitalized during those 7-encounters, suggests that he was in particular distress and in need of more substantial medical attention during the October 2, 2022 encounters that occurred at 4:42 p.m., 6:19 p.m. and 6:57 p.m. Faced with an inmate showing visible signs of alcohol withdrawal delirium and requesting hospitalization to alleviate his symptoms, Dagesse did nothing to mitigate the situation and, instead, denied his repeated requests for medical attention.

174.    Finally, since his first contact with Courchesne at 10:00 a.m. on October 1, 2022, Dagesse knew or should have known that Courchesne suffered from OUD and had been legally prescribed Suboxone as part of a MAT program for his OUD, as that information was documented in his file. Dagesse knew or should have known when his Suboxone was terminated, Courchesne was not provided opioid detoxification in violation of the CCDOC Opioid Detoxification Policy, which caused him to suffer opioid withdrawal concomitantly with his alcohol withdrawal, which Dagesse did nothing to address or mitigate.

*Tyler Kelsea*

175.    Kelsea had his first encounter with Courchesne on October 1, 2022, after he reported for duty at 3:00 p.m., at which time Courchesne was having tremors that were bothering him and told Kelsea that he was nervous about his detoxification and that he had consumed a fifth of alcohol a day for the last 7-years. Knowing the life-threating nature of alcohol withdrawal, Kelsea told Courchesne that if he started seeing or hearing things, to let him or someone else know,

and they would assist him. Kelsea knew those symptoms meant that alcohol withdrawal had worsened to alcohol withdrawal delirium, which was often fatal.

176.    Kelsea reported for duty the next day at 3:00 p.m., at which time he was made aware of the status and progression of his alcohol withdrawal and general condition since his last encounter with him on October 1, 2022. Around 3:00 p.m., Courchesne told Kelsea that he was hallucinating, and Kelsea told him to "try and remain calm." Then, at 3:17 p.m., Kelsea supposedly observed Olson give him Klonopin, which he "had to pour . . . into Inmate Courchesne's mouth because his tremors were so bad." From his initial encounter with Courchesne on October 1, 2022, Kelsea observed first-hand his symptoms worsen from hand tremors into delirium.

177.    Kelsea observed first-hand that Courchesne was not responding to the inadequate care he was provided. Kelsea responded to Cellblock 306 at 3:44 p.m., after being informed that Courchesne tied a pillowcase around his eyes and began to stumble around Cellblock 306 before laying on the floor at 3:40 p.m. Kelsea described his 3:44 p.m. encounter with Courchesne as follows:

> At 1544 I responded to Cellblock #306 to talk to Inmate Courchesne and to have him remove the pillowcase from his eyes. Inmate Courchesne removed the pillowcase and told me he had to do it because he kept seeing demons and devils everywhere . . . Inmate Courchesne . . . then started wandering around the Block showing me where he kept seeing the demons, he then grabbed the pillowcase again and put it over his eyes and sat at the table . . . Once Inmate Courchesne took the pillowcase off his eyes I had him take a seat on the stool by the Inmate telephone. I stood at the doorway of the block and landing and talked to Inmate Courchesne . . . During this time Inmate Courchesne kept telling me about the demons and devils and that they kept trying to drag him to hell.

178.    At 3:54 p.m., Dagesse entered Cellblock 306 to assist Kelsea in moving Courchesne to Cellblock 307-A, at which time he pleaded with them not to move him into segregation because that "would only make it worse." However, at 4:42 p.m., Courchesne was seen walking behind the bunks, so Dagesse and Kelsea transferred him to Cellblock 307-A, despite both having been told

that transferring him to that cell would worsen his condition. During the transfer to the segregation cell, Courchesne exhibited signs of severe confusion, stating that his friend "would be here to pick him up momentarily for a doctor appointment" that "he couldn't miss."

179.    While Dagesse and Kelsea were transferring him to Cellblock 307-A, Courchesne made his first request for medical attention and transfer to the hospital. Since Courchesne had not requested medical attention or transfer to a hospital during his prior encounters with Kelsea, this suggested or should have suggested to Kelsea that his medical condition was worsening and that he was in particular distress during this encounter. Kelsea denied his request for medical attention and transfer to a hospital and, instead, left him alone in his cell, wearing nothing but an anti-suicide smock, begging for medical attention and his clothes back.

180.    Aubin—the inmate in the next cell—heard Courchesne telling Dagesse and Kelsea that "he needed medical attention, he needed to see a doctor and that they could handcuff him and bring him to the hospital." Not only was his request for transfer to a hospital refused, but at 6:19 p.m., he was only offered his medication through the cell door and his vital signs were not checked for non-medical reasons, i.e., his agitation (a symptom of his delirium), despite Kelsea knowing from his prior encounters with Courchesne that he was unable to take it without assistance, and that his condition had since worsened.

181.    When Courchesne did not take his medication, Kelsea did not take any steps to ensure he received appropriate care and treatment by, for example, arranging for or requesting a transfer to a hospital, contacting supervisory personnel, calling 911 or taking other steps to ensure that Courchesne had access to medication to treat his serious, lift-threatening condition. The only purported reason for not entering his cell to assist him in taking his medication was his "agitated

state," which is not an excuse to refuse treatment necessary for a life-threatening condition and is an excuse that is undermined by subsequent interactions with Courchesne.

182.    For example, Kelsea entered Cellblock 307-A to retrieve pages from the book Courchesne had been given at 6:57 p.m.—less than 40-minutes after Dagesse, Kelsea and Olson refused to enter his cell to check his vitals and assist him in taking medication they knew he was unable to take without their assistance. While in his cell, Courchesne cooperated with their request to turn over the book, yet no attempt was made to check his vitals or give him the medication he was unable to take less than 40-minutes earlier. That Kelsea entered his cell to get a book, but not to provide him essential medical care, demonstrates his deliberate indifference.

183.    Moreover, prior to entering his cell at 6:57 p.m., Dagesse and Kelsea entered Cellblock 307 at 6:26 p.m., to mop up a urine puddle from the inmate in Cellblock 307-C, and "the entire time Inmate Courchesne can be heard talking incoherently," yet neither Dagesse nor Kelsea took any steps to prevent the continued worsening of his condition. That he was incoherent also shows that he lacked the mental capacity to refuse necessary, life-saving medical treatment, and required transfer to a hospital where his alcohol withdrawal delirium and, specifically, the agitation he was exhibiting as a result could be appropriately managed.

184.    Kelsea entered Cellblock 307 4-times after his 6:57 p.m. encounter, including at 7:15 p.m., 8:00 p.m., 8:25 p.m. and 9:29 p.m., and on each occasion, Kelsea heard Courchesne talking incoherently. When Kelsea entered Cellblock 307 at 9:29 p.m., he and Purrington heard Courchesne talking to and debating with his hallucinations and banging on his cell door for approximately 30-minutes, yet neither Kelsea nor Purrington took any steps to get him medical attention or prevent the worsening of his condition, despite Aubin hearing Courchesne making repeated pleas to them to be transferred to a hospital for medical attention.

185.    Kelsea knew that: (1) Courchesne was a severe alcoholic; (2) he was exhibiting signs of alcohol withdrawal as early as October 1, 2022, at 10:00 a.m.; (3) his alcohol withdrawal worsened over the course of his subsequent encounters with Courchesne until he was in a state of delirium that continued to get worse; and (4) his vital signs were not checked and he was not given his medication on October 2, 2022, at 6:19 p.m. (the last dose he should have received before he died), in a way he could have taken it given he was and remained unable to take medication without assistance, which amounts to withholding essential treatment for non-medical reasons.

186.    Further, Kelsea had approximately 4-encounters with Courchesne before he made his first request to be taken to a hospital for medical attention. That Courchesne did not request to be hospitalized during those 4-encounters, suggests that he was in particular distress and in need of more substantial medical attention during the October 2, 2022 encounters that occurred at 4:42 p.m., 6:19 p.m., 6:57 p.m. and thereafter. Faced with an inmate showing visible signs of alcohol withdrawal delirium and requesting hospitalization to alleviate his symptoms, Kelsea did nothing to mitigate the situation and, instead, denied his repeated requests for medical attention.

### *Zacharie Covill*

187.    Covill had his first encounter with Courchesne on October 1, 2022, at 7:40 a.m., at which time he had tremors in both of his hands and advised that he used alcohol every day for the past 7-years to cope with the death of his father. Courchesne was started on a "detox protocol" at the time of that first encounter. Covill observed first-hand that Courchesne was not responding to the detox protocol and, to the contrary, observed his alcohol withdrawal worsen from hand tremors to severe body tremors and profuse sweating to delirium with hallucinations over the course of his subsequent encounters with him on October 1-2, 2022.

188.    With respect to the night of October 1, 2022, Covill observed the worsening of his withdrawal, stating: "I observed Inmate Courchesne suffering from severe body tremors and was profusely sweating during every interaction." Then, on October 2, 2022, at 10:20 a.m., Courchesne told Covill that he was hallucinating, which meant that since his initial encounter with Covill, his alcohol withdrawal had worsened to delirium. Finally, at 2:17 p.m., Courchesne told Covill that he was still hallucinating and complained of his body tremors. In fact, Covill stated that the body tremors were so severe at 2:17 p.m. that:

> Nurse Olson had to assist Inmate Courchesne in taking his medication due to his uncontrollable shaking.

189.    By his last encounter with Courchesne at 2:17 p.m. on October 2, 2022, Covill knew or should have known that Courchesne had not received the treatment required by the Alcohol Detox Policy (a benzodiazepine), and that the inadequate medical care he had been receiving since 7:40 a.m. on October 1, 2022 was ineffective and not improving his alcohol withdrawal, which he observed worsen from hand tremors to severe body tremors to delirium with tremors that were so bad he could not take medication without assistance. Confronted with such clear and objective signs that his already-serious medical condition was worsening, Covill did nothing to mitigate the situation when he knew or should have known that certain interventions (transfer to a hospital for intravenous administration of benzodiazepine) would have improved his condition.

190.    Finally, since his first contact with Courchesne at 3:00 p.m. on October 1, 2022, Kelsea knew or should have known that Courchesne suffered from OUD and had been legally prescribed Suboxone as part of a MAT program for his OUD, as that information was documented in his file. Kelsea knew or should have known when his Suboxone was terminated, Courchesne was not provided opioid detoxification in violation of the CCDOC Opioid Detoxification Policy,

which caused him to suffer opioid withdrawal concomitantly with his alcohol withdrawal, which Kelsea did nothing to address or mitigate.

***Garrett Purrington***

191.    Purrington had his first encounter with Courchesne on October 1, 2022, after Courchesne arrived at the CCDOC. Courchesne told Purrington that he was drinking a "half gallon of hard liquor" a day and would be going through alcohol withdrawal. He also told Purrington that has was taking Suboxone. When Purrington arrived for duty on October 2, 2022, he was informed that Courchesne's condition and alcohol withdrawal had worsened into delirium, and that his vital signs were not check and his medication was not administered during the medication pass at 6:19 p.m. on October 2, 2022.

192.    Purrington observed first-hand that the serious medical condition Courchesne was suffering from had worsened since his last encounter with him on October 1, 2022, and that he was not responding to the inadequate treatment he was provided. He also knew Courchesne had not taken any medication, and his vital signs were not checked during the 6:19 p.m. medication pass, when Dagesse, Kelsea and Olson refused to enter his cell for the non-medical reason that he was agitated as a result of his untreated alcohol withdrawal delirium. At 6:57 p.m., Dagesse, Kelsea and Purrington entered Cellblock 307-A, and Purrington described the encounter as follows:

> While in the cell Inmate Courchesne was very boisterous and unintelligible while asking us to take the handcuffs off him. He was not handcuffed or in any kind of hand restraints at this time.

193.    Purrington went on to state: "For the next two hours Inmate Courchesne could be seen and heard through the Inmate Monitoring System hitting his door and seemingly talking to people that were not there." While Purrington was in Cellblock 307-A at 6:57 p.m., Aubin heard Courchesne ask for medical attention and to go to the hospital, but his request was denied, despite

Purrington knowing that Courchesne did not take his medication or have his vital signs checked during the evening medication pass, and knowing that the clear, objective sings he observed first-hand demonstrated that his condition had significantly worsened since their first encounter.

194.    Then, at 9:18 p.m., Purrington responded to Cellblock 307-C for another inmate and, while there, he continued to hear Courchesne speaking in an incoherent manner and hitting his door sporadically. Purrington remained in Cellblock 307 until 9:45 p.m. with Kelsea, all the while Purrington observed that "Courchesne continued to show detox symptoms by hallucinating and incoherently talking." Although he was hallucinating, Aubin said that Courchesne "begged for medical attention and to go to the hospital every time a CO entered Cell Block 307," which would include when Purrington and Kelsea entered at 9:18 p.m.

195.    Purrington again entered Cellblock 307 at 9:50 p.m. to retrieve items taken from Cellblock 307-C and to mop up the common area floor, at which time he observed Courchesne "continue[] to hit his door and ramble on in an incomprehensible manner." Confront with clear, objective signs that Courchesne's already-serious medical condition had and continued to worsen from his initial encounter with Courchesne on October 1, 2022, Purrington chose to effectively do nothing to mitigate the situation when he knew or should have known that certain interventions would have improved his condition.

196.    Moreover, after Purrington entered his cell at 6:57 p.m., Courchesne asked for and was denied medical attention. Aubin stated that on October 2, 2022, "Correctional Officers came into Courchesne's cell and denied him medical attention." The correctional officers who entered his cell were Dagesse, Kelsea and Purrington. This means Courchesne asked for and was denied medical attention by these three officers, each of whom had observed his already-serious medical

condition worsen during their encounters with him, knew he had not taken needed medication at 6:19 p.m., and knew that medical intervention was needed to prevent his death.

197.    Purrington knew that: (1) Courchesne was a severe alcoholic taking Suboxone; (2) would be going through withdrawal based on his October 1, 2022 encounter; (3) his alcohol withdrawal worsened over the course of his subsequent encounters until he was suffering delirium that continued to get worse, despite the inadequate medical treatment he was provided; and (4) his vital signs were not checked and he was not given his medication on October 2, 2022, at 6:19 p.m. (the last dose he should have received before he died). Instead of taking any action to prevent his demise, Purrington entirely ignored Courchesne and his pleas for medical attention.

*Richard Biron*

198.    Biron—the Sergeant in charge on October 2, 2022, from 3:00 p.m. to 10:53 p.m.— entered the CCDOC earlier that day at 2:38 p.m., at which time he was "made aware that Inmate Courchesne, Joseph was experiencing hallucinations" due to his alcohol withdrawal delirium. He was also made aware of the status and progression of his alcohol withdrawal, OUD, Suboxone withdrawal and general condition since he arrived at CCDOC on October 1, 2022. That is, he knew Courchesne's alcohol withdrawal had worsened since his arrival at the facility from hand tremors to severe body tremors to delirium with hallucinations.

199.    On October 2, 2022, at 3:09 p.m., Biron received a call from Dagesse informing him that Courchesne had tapped on the intercom and said he was feeling worse. Biron knew when Dagesse, Kelsea and Olson responded to Cellblock 306 at 3:17 p.m., his tremors were so severe that he was unable to take medication himself, and Olson had to pour the medication directly into his mouth because of his uncontrollable shaking. Biron also observed first-hand that Courchesne

was not responding to the inadequate treatment he was provided, and that his already-serious, potentially fatal medical condition was continuing to worsen.

200.    For example, at 3:40 p.m., Biron observed Courchesne tie a pillowcase around his eyes, as a result of which he instructed Dagesse and Kelsea to have him remove the pillowcase. Biron was then informed that Courchesne said he had to tie the pillowcase around his eyes because he kept seeing demons and devils everywhere. He was also informed that Courchesne pleaded not to be moved into segregation because that would worsen his condition. However, at 4:42 p.m., Biron ordered Dagesse and Kelsea to move Courchesne to Cellblock 307-A, despite knowing that this would only worsen his condition.

201.    By 6:19 p.m., Biron knew that Courchesne was banging on his cell door, demanding medical attention and requesting transfer to a hospital. Not only was his request for transfer to a hospital refused, due to his agitation (a known symptom of alcohol withdrawal delirium), he was only given his medication through the cell door chase, which was a decision made or approved by Biron, who was the Sergeant in charge, and knew Courchesne had previously been unable to take medication himself due to his alcohol withdrawal delirium symptoms, which had only worsened since and left him unable to take his medication in the manner provided at 6:19 p.m.

202.    When Courchesne did not take his medication, Biron did not take any steps to ensure he received appropriate care and treatment by, for example, arranging for or requesting a transfer to a hospital where the medication could be given intravenously, calling 911 or taking other steps to ensure that Courchesne had access to medical care to treat his life-threatening condition. The only purported reason for not entering his cell to assist him in taking his medication was his "agitated state," which is not an excuse to refuse treatment necessary for a life-threatening condition and is an excuse that is undermined by subsequent interactions with Courchesne.

203.    For example, despite his purported "agitation" that prevented anyone from entering his cell to administer necessary medication, at 6:57 p.m., Biron directed Dagesse, Kelsea and Purrington to enter his cell to retrieve pages from a book he had been given, yet he did not direct them to take any steps to administer the medication Courchesne was unable to take in the manner given less than 40-minutes earlier. If it was safe enough to send correctional officers into his cell to retrieve a book, it was certainly safe enough to have them enter to provide medication to an inmate whose life-threatening condition was continuing to worsen.

204.    From no later than 6:52 p.m. until the end of his shift at 10:53 p.m., Biron observed Courchesne "via monitor," during which time Courchesne was seen talking to his hallucinations and hitting his cell door. Further, while Biron was observing Courchesne from 6:30 p.m. to 7:00 p.m., during which time Purrington confirmed that Courchesne could be "heard through the Inmate Monitoring System," Aubin said that Courchesne "again requested medical attention," and heard him yelling out from his cell that he needed to see a doctor and that they could handcuff him and bring him to the hospital. Biron ignored his pleas for medical attention, knowing that certain medical interventions, such as medication (which were not given during the evening medication pass) and transfer to a hospital, were necessary to improve his condition.

205.    Biron knew that: (1) Courchesne was suffering from alcohol and opioid withdrawal that worsened from hand tremors to severe body tremors to delirium with hallucinations; (2) his alcohol and opioid withdrawal worsened, despite the limited treatment he received, which was so clearly inadequate to treat his alcohol withdrawal delirium and did not treat his opioid withdrawal at all; (3) his vital signs were not checked and he was not given his medication on October 2, 2022, at 6:19 p.m., in a way he could have taken it since he was and remained unable to take medication without assistance, which amounts to withholding essential treatment for non-medical reasons;

and (4) he was left without medical supervision after the 6:19 p.m. encounter with Olson, during which no medication was given and vitals were not checked.

206.    Further, during and after the 6:57 p.m. encounter, Biron monitored Courchesne through the inmate monitoring system, through which Courchesne could be seen and heard, as confirmed by Purrington. Aubin stated that from 6:30 p.m. through 7:00 p.m., Courchesne "again requested medical attention," and was yelling out from his cell that he needed to see a doctor and that they could handcuff him and bring him to the hospital. Biron had at least one encounter with Courchesne at 4:02 p.m. and knew of several other encounters he had with correctional officers after his shift started, during which Courchesne had not requested to be taken to a hospital, which suggested that he was in particular distress and in need of more substantial medical attention when he was yelling for it from his cell from 6:30-7:00 p.m.

***Zachary Benoit***

207.    Benoit had his first encounter with Courchesne on October 1, 2022, at 12:53 a.m., at which time he walked him into the CCDOC vestibule, providing him with a first-hand baseline of his condition upon arrival and before any medical treatment had been initiated. He encountered Courchesne again on October 2, 2022, when he entered Cellblock 307 for "lights out," by which time his alcohol and opioid withdrawal had worsened significantly since his first encounter with Courchesne, which Benoit knew or should have known and which was apparent due to his transfer from Cellblock 306 to Cellblock 307 for segregation.

208.    Aubin overheard the October 2, 2022 "lights out" encounter between Courchesne and Benoit, which he described as follows: "at lights out, CO Benoit entered Cell Block 307. Joey begged him for medical attention and to not shut off the lights because someone he believed to see in his cell was going to kill him. CO Benoit laughed at Joey then shut off the lights." This shows

that Benoit had first-hand knowledge that Courchesne was hallucinating—which was a symptom he had not exhibited during their prior encounter—and requesting medical attention to treat his alcohol withdrawal delirium.

209.    Not only did Benoit fail to take steps to provide Courchesne with medical care that he knew was necessary to prevent his demise, but he actually "laughed" at his request for medical attention, clearly displaying his deliberate indifference to the serious medical needs of Courchesne. Further, Benoit shutoff the lights, leaving Courchesne unmedicated and suffering from delirium in a dark room without medical supervision, when he knew or should have known that persons experiencing delirium must be kept in a well-lit room with continuous monitoring of vital signs to avoid aggravating, exacerbating and worsening their withdrawal symptoms.

210.    As Benoit knew or should have known would happen due to his failure to provide Courchesne with necessary medical care and decision to keep him in a dark room without medical supervision, the delirium from which Courchesne was suffering worsened to such an extent that it caused his death shortly after "lights out." In fact, Aubin "did not hear Joey speak another word after the lights were shut off" and stated that "no one came to check on [him] after he suddenly stopped speaking and begging for medical help until about an hour or two later when CO Benoit returned and found [him] unresponsive," which is consistent with his discoloration at that time.

*Scott Covey*

211.    Covey arrived to the CCDOC on October 2, 2022, at 10:50 p.m., at which time he received a shift report from Biron, which informed him that Courchesne was placed in Cellblock 307-A because he was detoxing from alcohol and had started to hallucinate, meaning his alcohol withdrawal worsened from severe to delirium. During the first hour of his shift, Covey observed Courchesne kicking, banging and ramming his cell-door with his shoulder, dancing, and yelling,

which, according to Aubin, was for medical attention and transfer to a hospital. He then stated that he noticed a change in his behavior, prompting the need for a welfare check.

212.    The change in behavior Covey claimed to have observed was that Courchesne had stopped banging his cell-door and yelling and lied down on his mattress on the floor. First, he was never laying on his mattress on the floor, as Covey claims. The video footage shows Courchesne laying on his anti-suicide smock on the floor, with his mattress remaining on his bed well-after the time he is found unresponsive. Second, Courchesne did not lay down on the floor, as Covey makes it seem. Instead, after "lights out", he is seen stumbling around his cell and falling onto the floor numerous times before ceasing all movement upon his death.

213.    Third, the first marked change in behavior occurred upon "lights out," when, as shown in the video footage, he begins frantically banging on and kicking his cell-door, which he was not doing before the lights were turned off. Covey admits that he observed this behavior, yet failed to take any steps to mitigate the situation when he knew or should have known that certain interventions (transfer to a hospital, administration of benzodiazepine, medical supervision in a well-lit room) would have improved his condition. This first marked change in behavior occurred more than 30-minutes before Courchesne ceased movement on the floor.

214.    The second marked changed in his behavior occurred shortly thereafter when he started to stumble around his cell and fall on the floor numerous times before ceasing all movement upon his death. This second marked change in behavior occurred more than 12-minutes before Courchesne ceased movement on the floor. Both of these marked behavioral changes demonstrated that his life-threatening condition was continuing to worsen after "lights out," while he was being observed by Covey, who delayed requesting a welfare check until after he had not seen movement for "a while," by which time Courchesne had died.

215.    Based on his observation of these marked behavioral changes, combined with his knowledge from the shift report and otherwise that the alcohol withdrawal delirium from which Courchesne was suffering had continued to worsen to such an extent that he had to be transferred into segregation for observation, Covey knew or should have known that his demise was easily preventable through certain medical interventions (transfer to a hospital, medication), yet he failed to even request a welfare check until "a while" after Courchesne ceased all movement and died on the floor of his cell from his untreated alcohol withdrawal delirium.

**C. The Municipal Defendants Adopted Policies, Implemented Training Protocols, and Allowed Customs to Develop That Violated Courchesne's Constitutional Rights**

216.    Defendants Coös County and CCDOC (the "Municipal Defendants") intentionally adopted policies, implemented training protocols, and allowed customs to develop that caused a violation of Courchesne's constitutional rights, when they knew or should have known of the serious risk that those policies, training protocols and customs would result in unconstitutional conduct, as it did here. As set forth below, the Municipal Defendants intentionally: (a) adopted a policy of denying inmates, such as Courchesne, legally prescribed medication for the treatment of OUD, (b) failed to implement training protocols on how to monitor detainees, detect when they need urgent medical care, and detect and monitor the symptoms of alcohol and opioid withdrawal, the medical needs of inmates experiencing such symptoms and the appropriate course of action; and (c) allowed customs of not treating alcohol withdrawal and not transferring inmates to properly equipped medical facilities to develop.

    i.    The Municipal Defendants Adopted A Policy Of Denying Inmates Legally Prescribed Medication For The Treatment Of OUD

217.    The Municipal Defendants implemented a policy titled, Administering Prescribed Medication (the "Prescribed Medication Policy"). The policy states, in pertinent part: "Suboxone

or its generic equivalents will not be allowed into or administered in this facility under any circumstances." Their separate policy titled, Opioid Detoxification (the "Opioid Detox Policy"), does not provide for the administration of medications to treat OUD and, instead, only calls for the administration of medications to manage symptoms of opioid withdrawal. This blanket prohibition on the administration of Suboxone or its generic equivalent—together with the Opioid Detox Policy not providing for the treatment of OUD—does not take into consideration the needs of the individual inmate, especially those who were legally prescribed Suboxone or its generic equivalent before their detainment, and amounts to a refusal to even consider whether a particular course of treatment is appropriate.

218.    The blanket prohibition on the administration of Suboxone caused a termination of the administration of MAT Courchesne needed to treat his OUD, which caused him to suffer opioid withdrawals, as evidenced by his hypertension, tachycardia and tremors, and also exacerbated his concomitant severe alcohol withdrawal, thereby contributing to his untimely death. The Municipal Defendants knew or should have known of the serious risk that the Prescribed Medication Policy and Opioid Detox Policy would result in an unconstitutional denial of necessary medical treatment that would increase fatalities and worsen outcomes for those with OUD, who were "very common" among those detained at the CCDOC. For instance, the New Hampshire Governor's Commission on Alcohol and Other Drugs Opioid Task Force (the "Opioid Task Force") issued its findings and recommendations concerning the treatment of OUD for those involved with the New Hampshire Justice System, stating, in pertinent part:

> Data suggests that treatment of OUD with FDA-approved medications --
> methadone, buprenorphine, and naltrexone -- reduces deaths and improve outcomes
> for those with OUD.

https://www.dhhs.nh.gov/sites/g/files/ehbemt476/files/documents/2021-11/bdas-oud-just-sys-rpt-062019.pdf (last visited November 5, 2024) (the "Task Force Findings").

219.    Suboxone is a combination medicine containing Buprenorphine and Naloxone—two of the FDA-approved medications shown to reduce deaths and improve outcomes for inmates with OUD. The Municipal Defendants further knew or should have known that the Prescribed Medication Policy—prohibiting administration of Suboxone under any circumstances—and the Opioid Detox Policy—which does not provide for the treatment of OUD—were unconstitutional based on prior court rulings. For example, after discussing the data suggesting that treatment with Buprenorphine and Naloxone (i.e., Suboxone) reduces deaths and improves outcomes for those with OUD, the Opioid Task Force discussed the unconstitutionality of withholding such necessary treatment from inmates, stating:

> in November 2018, a federal court in Massachusetts granted a preliminary injunction, which required that a person who was to be incarcerated be provided continued access to methadone treatment for his OUD while incarcerated. Many are calling the case important legal precedent in its finding that denying incarcerated individuals with OUD access to ongoing medication can violate the law under both the Americans with Disabilities Act and the U.S. Constitution.

Task Force Findings at p. 12.

220.    The Municipal Defendants intentionally implemented the Prescribed Medication Policy and Opioid Detox Policy, when they knew or should have known that those policies were unconstitutional in that they deny detained individual with OUD access to ongoing medication that was legally prescribed before their detainment, which the data shows increases deaths and worsens outcomes for those with OUD, such as Courchesne, who, due to these policies, was forced to suffer needlessly from untreated OUD and opioid withdrawals as a result of the abrupt discontinuation of his Suboxone use, which ultimately contributed to his death. The Municipal Defendants knew or should have known that the Prescribed Medication Policy and Opioid Detox Policy would cause

the painful and severe side effects of a forced withdrawal by abruptly terminating the Suboxone use of a detainee, who had been legally prescribed that medication to treat OUD, which amounts to deliberate indifference of a serious medical need.

ii.  The Municipal Defendants Failed To Implement Training Protocols

221.    The Municipal Defendants failed to implement training protocols to train its agents, servants and employees, including Harrison, Olson, Soucy, Kelsea, Dagesse, Covill, Purrington, Biron, Benoit and Covey (the "Individual Defendants"), on how to monitor detainees, detect when they need urgent medical care, and detect and monitor the symptoms of alcohol and opioid withdrawal, the medical needs of inmates experiencing such symptoms and the appropriate course of action. While the Municipal Defendants contracted with NHS to provide trainings, the scope of those trainings did not include how to monitor detainees or detect when they need urgent medical care. The result of this failure to train led to a practice of not conducting in-person physical checks of detainees and, instead, relying on a video monitoring system that was inadequate to detect signs and symptoms of medical distress, which resulted in Covey not timely detecting when Courchesne needed urgent medical care until after he had been unresponsive "for a while."

222.    Further, the NCCHC Standards for Health Services in Jails require correctional officers working with inmates to receive health-related training biennially, require the training to include recognizing the signs and symptoms of withdrawal, and make explicitly clear that "severe withdrawal syndromes must never be managed outside of a hospital," because "[d]eaths from acute intoxication or severe withdrawal have occurred in correctional institutions." Since each of the Individual Defendants kept Courchesne in the CCDOC when faced with clear signs and symptoms of his severe alcohol withdrawal, they were *either* not provided training on how to detect and monitor the symptoms of withdrawal, the medical needs of inmates experiencing such symptoms

and the appropriate course of action to be taken for such inmates *or* the training was so inadequate that it amounted to no training at all.

223.    The Municipal Defendants knew that inevitably some inmates arrive at the CCDOC with urgent health problems requiring hospitalization, especially since they were "seeing detox cases from several abused substances" to such an extent that inmates with substance use disorders were "very common" at their facility. The Municipal Defendants were also on notice of the dangers of alcohol and opioid withdrawal, which was a recurring problem. Accordingly, the failure to provide Courchesne adequate medical care—a constitutional right held by pre-trial detainees— was a highly predictable consequence of a failure to equip the Individual Defendants with specific tools and training to handle the recurring situations, i.e., detainees presenting with a substance use disorder requiring detoxification. There is also ample evidence that the failure to implement proper training protocols was one of the causes of their failure to provide adequate medical care.

224.    As discussed above, there were several opportunities for the Individual Defendants to prevent the onset of delirium tremens or, at a minimum, detect its onset, provide adequate treatment, and transfer Courchesne to a hospital in compliance with national standards, including those specifically designed to address the adequate treatment of inmates experiencing withdrawal at correctional facilities. The Municipal Defendants knew or should have known of the serious risk that the failure to implement training protocols and provide training to correctional officers would result in unconstitutional conduct, specifically the deprivation of the right to adequate medical care, especially since detainees with substance use disorders requiring detoxification were "very common" at the CCDOC and, in fact, "plague [its] population." The failure to implement training protocols and ensure adequate training were a direct and proximate cause of the physical pain and suffering Courchesne experienced, as well as his death.

iii. The Municipal Defendants Allowed Customs Of Not Treating Alcohol Withdrawal And Not Transferring Inmates To Hospitals To Develop

225.    The Municipal Defendants allowed customs to develop of denying detainees with adequate alcohol withdrawal treatment and refusing to transfer them to the hospital, when it is or should be known that urgent medical care is needed. This custom is evidenced by the fact that not a single one of the ten Individual Defendants provided Courchesne with the alcohol withdrawal treatment required by the Alcohol Detox Policy, indicating that the Municipal Defendants allowed a custom to develop of denying detainees with adequate alcohol withdrawal treatment.

226.    The same is true with respect to each of the Individual Defendants failing to transfer Courchesne to the hospital when it was or should have been known that urgent medical care in a hospital setting was needed. The existence of this custom is even more apparent because not only did none of the Individual Defendants permit his transfer, at least five of them specifically denied his request to be transferred to a hospital setting, one of whom laughed in response, when they knew or should have known he needed more substantial medical attention.

227.    The foregoing customs violated the constitutionally guaranteed right of Courchesne to receive adequate medical care, and the Municipal Defendants knew or should have known that allowing such customs to develop would result in unconstitutional conduct, especially in light of the significant number of detainees at the CCDOC requiring detoxification. These customs resulted in Courchesne not receiving adequate medical care in the face of a patently obvious serious medical need to which the Municipal Defendants were indifferent.

## FIRST CAUSE OF ACTION

### 42 U.S.C. § 1983 Claim For Deliberately Indifferent Medical Care
### Against All Individual Defendants

228.    Plaintiffs reiterate and re-allege each of the foregoing allegations with the same force and effect as if fully set forth herein.

229.    Fourteenth Amendment substantive due process requires the government to provide adequate medical care to pretrial detainees, as Courchesne was at all relevant times herein while he was detained at the CCDOC through his death on October 3, 2022.

230.    The Individual Defendants are liable to Plaintiffs under 42 U.S.C. § 1983 for the damages stemming from their respective violations of Courchesne's right to adequate medical care secured by the Fourteenth Amendment.

231.    Harrison, Olson and Soucy (the "Clinician Defendants") were medical providers licensed to practice in the State of New Hampshire and, at all relevant times, provided medical services to CCDOC inmates, including Courchesne.

232.    Kelsea, Dagesse, Covill, Purrington, Biron, Benoit and Covey (the "CO Defendants") were correctional officers employed by Coös County and/or CCDOC, who were acting under color of state law in the course and scope of their duties and functions.

233.    Each of the Individual Defendants knew or should have known that Courchesne was suffering from serious medical conditions, including alcohol withdrawal that progressed from severe to delirium tremens, OUD and Suboxone withdrawal, which worsened over each encounter that each of the Individual Defendants had with Courchesne, without exception.

234.    Each of the Individual Defendants acted and were deliberately indifferent to the serious medical needs of Courchesne in that each denied him needed medical care (stabilization of

his OUD with opioid therapy, benzodiazepines, transfer to a hospital), without any non-punitive medical reason, suggesting that the denial of needed care was punishment.

235. Each of the Individual Defendants also had actual knowledge of impending harm (worsening withdrawal, death) that was easily preventable with medical intervention (stabilization of his OUD with opioid therapy, benzodiazepines, transfer to a hospital), yet each of the Individual Defendants failed to take the steps that would have prevented that harm.

236. Instead, each of the Individual Defendants provided and/or acquiesced in the giving of medical care that was so clearly inadequate as to amount to a refusal to provide essential care, as evidenced by the care provided breaching the standard of care, the Alcohol Detox Policy, the Opioid Detox Policy, and the NCCHC Standards for Health Services in Jails.

237. Confronted with clear, objective signs that the concomitant alcohol and Suboxone withdrawal Courchesne was suffering from was worsening during their respective encounters with him, each of the Individual Defendants deliberately chose to effectively do nothing to mitigate the situation when each knew or should have known that certain medical interventions would have easily prevented the worsening of his symptoms and his death.

238. The conduct and inactions of the Individual Defendants, acting under color of state law, was done with deliberate indifference to Courchesne and his serious medical needs, and was so inadequate as to shock the conscience. The deliberate indifference exhibited by each of the Individual Defendants was a direct and proximate cause of the pain, suffering and death suffered by Courchesne and violated the rights guaranteed to him by 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution.

239. As a direct and proximate cause of the foregoing, Courchesne was forced to suffer from severe pain and suffering, including, but not limited to, symptoms of alcohol withdrawal that

progressed to delirium tremens concomitantly with untreated OUD and opioid withdrawals due to the abrupt termination of his Suboxone use, which collectively caused him to suffer hypertension, tachycardia, tremors, sweats, agitation, confusion and hallucinations so severe he believed that the devil and demons were dragging him to hell. Further, the Estate of Joseph Courchesne has been deprived of the earnings that Courchesne would have reasonably expected to earn over the course of his lifetime had his life not ended, together with funeral and burial expenses.

240.    As a direct and proximate cause of the foregoing, Mrs. Courchesne has suffered and will continue to suffer the loss of consortium, intimacy, service, society, and support of her husband; the loss of his income and earning capacity; and other benefits, including, but not limited to, pension benefits, health insurance, and other insurance and benefits. Further, Mrs. Courchesne has been forced and will continue to be forced to raise C.C. and J.C. without the parental guidance, service, and support of her husband; and due to the premature death of her husband, will be forced to contend with the issues and problems arising from the absence of a father-figure in the life of her children, C.C. and J.C.

241.    As a direct and proximate cause of the foregoing, C.C. and J.C. have suffered and will continue to suffer the loss of parental consortium, service, society, support, parental guidance and parental support of their father; the loss of the income and earning capacity of their father; and the loss of benefits, including, but not limited to, pension benefits, health insurance, and other such benefits to which they would have been entitled through their father. Further, C.C. and J.C. will be forced to grow-up without a father-figure, the absence of which will cause or increase the odds of them suffering the effects caused by such an absence, including diminished self-concept, compromised physical and emotional security, feelings of abandonment, self-loath, behavioral

problems, difficulties with social adjustment, truancy, poor academic performance, alcohol and drug abuse, anxiety and depression, among others.

242.    By reason of the foregoing, Plaintiffs are entitled to recover all of their respective damages from the Individual Defendants.

## SECOND CAUSE OF ACTION

### 42 U.S.C. § 1983 Claim Against The Municipal Defendants

243.    Plaintiffs reiterate and re-allege each of the foregoing allegations with the same force and effect as if fully set forth herein.

244.    The Municipal Defendants intentionally adopted policies, implemented training protocols, and allowed customs to develop that violated the constitutional right Courchesne had to receive adequate medical care while he was being held as a pre-trial detainee at the CCDOC under 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution and, as a direct and proximate cause of such policies, protocols and customs, Courchesne was forced to endure extreme pain and suffering throughout the entire period of his detainment and, ultimately, those policies, protocols and customs each proximately caused or contributed to his death.

245.    The Municipal Defendants intentionally: (a) adopted a policy of denying inmates, such as Courchesne, medication for the treatment of OUD that had been legally prescribed prior to their detainment, (b) failed to implement training protocols on how to monitor detainees, detect when they need urgent medical care, and detect and monitor the symptoms of alcohol and opioid withdrawal, the medical needs of inmates experiencing such symptoms and the appropriate course of action required; and (c) allowed customs to develop of not treating alcohol and opioid withdrawal and refusing requests for transfers to hospitals.

246.    **First**, the Municipal Defendants intentionally implemented a written policy that expressly prohibited Courchesne and other pre-trial detainees from receiving medications to treat their OUD (Suboxone) that had been legally prescribed prior to their detainment, without offering or providing any substitute treatment or opioid withdrawal medication. The Municipal Defendants knew or should have known that implementing such a policy was unconstitutional in that it would deny detainees with OUD access to ongoing medication that was legally prescribed prior to their detainment, which they knew or should have known would worsen outcomes for those with OUD, cause opioid withdrawal, and increase the occurrence of the very outcome here—death.

247.    **Second**, the Municipal Defendants failed to implement training protocols to train its agents, servants and employees, including each of the Individual Defendants, on how to monitor detainees, detect when they need urgent medical care, and detect and monitor the symptoms of alcohol and opioid withdrawal, the medical needs of inmates experiencing such symptoms and the appropriate course of action. The result of this failure to train led to a practice of not conducting in-person physical checks of detainees and, instead, relying on a video monitoring system that was inadequate to detect signs and symptoms of medical distress, which resulted in a welfare check not being requested or performed on Courchesne until <u>after</u> he died.

248.    Further, the NCCHC Standards require correctional officers to be trained in how to detect and recognize the signs and symptoms of withdrawal, while making it clear that they should be trained to know that severe withdrawal must never be managed outside of a hospital since it is often fatal when not properly and timely managed. Since each of the Individual Defendants kept Courchesne in a prison cell when they were faced with clear signs and symptoms of his severe alcohol withdrawal, they were *either* not provided training on how to detect and monitor symptoms

of withdrawal, the medical needs of inmates with such symptoms and the necessary action to be taken for such inmates *or* the training was so inadequate it amounted to no training at all.

249.  **Third**, the Municipal Defendants allowed customs to develop of denying detainees with adequate alcohol withdrawal treatment and refusing to transfer them to the hospital, when it is or should be known that urgent medical care is needed. While the Municipal Defendants had an Alcohol Detox Policy requiring the administration of Ativan (a specific benzodiazepine) in 1-mg doses 3-times a day for detainees with severe alcohol withdrawal <u>or</u> hallucinations, they allowed a custom to develop and implemented a *de facto* policy of denying detainees with such treatment and ignoring the mandates of the Alcohol Detox Policy.

250.  *First*, the CCDOC did not even have Ativan available to treat detainees suffering severe alcohol withdrawal or hallucinations, which was a "very common" issue—one that it self-described as a "plague" on its population. *Second*, each of the three Clinician Defendants failed to administer Courchesne any benzodiazepines either when he was known to be suffering from severe alcohol withdrawal or, thereafter, when his condition worsened from severe to delirium tremens and he began hallucinating, despite having multiple encounters with Courchesne and opportunities to provide him with necessary medical care. For instance:

> (a) <u>Harrison</u>: she knew that Courchesne was suffering from severe alcohol withdrawal at 7:40 a.m. on October 1, 2022, yet failed to provide him with any treatment for his alcohol withdrawal at that time, or during her subsequent encounters later that day at 10:00 a.m. and 2:00 p.m., nor did she provide any such treatment during her 6:00 p.m. encounter, by which time Courchesne was hallucinating.

> (b) <u>Olson</u>: he knew that Courchesne was suffering from alcohol withdrawal delirium with hallucinations by 10:00 a.m. on October 2, 2022, yet failed to provide him with any treatment for his alcohol withdrawal at that time, or during his subsequent encounter at 2:17 p.m. and although he claims to have provided a single dosage of Klonopin at 3:17 p.m., toxicology indicates that it was not given, but if it was, he was required to provide another dosage that evening, which he failed to do.

(c) <u>Soucy</u>: he knew that Courchesne was suffering from severe withdrawal at 7:40 a.m. on October 1, 2022, yet failed to order any medication to treat his alcohol withdrawal at that time or later that day at 6:00 p.m., when he was informed that Courchesne began hallucinating and, to the contrary, he intentionally delayed ordering any treatment for his severe alcohol withdrawal knowing it had worsened to delirium tremens.

251.    That there were so many instances where the Clinician Defendants refused to give Courchesne medical treatment for his alcohol withdrawal in violation of the Alcohol Detox Policy shows that the Municipal Defendants allowed a custom to develop of refusing or delaying essential medical care to detainees suffering alcohol withdrawal, and allowed a custom to develop and/or implemented a *de facto* policy of refusing or delaying essential medical care to detainees suffering alcohol withdrawal and ignoring the mandates of the Alcohol Detox Policy—which they knew or should have known would result in detainees being denied essential medical care in violation of their constitutional rights.

252.    The Municipal Defendants further allowed a custom to develop or had a *de facto* policy of refusing to transfer detainees to a hospital or other acute care facility. The existence of such a custom or *de facto* policy is evidenced by the fact that: (a) none of the **ten** Individual Defendants transferred or took any steps to transfer Courchesne to a hospital or other acute care medical facility, despite that each knew or should have known he required urgent medical care in a hospital setting; (b) at least **five** of those Individual Defendants specifically denied his request to be transferred to a hospital; and (c) at least one of those Individual Defendants laughed at his request to be transferred to a hospital.

253.    The foregoing policies, training protocols (or lack thereof), and customs were a direct and proximate cause of the pain, suffering and death suffered by Courchesne and violated the rights guaranteed to him by 42 U.S.C. § 1983 and the Fourteenth Amendment to the United

States Constitution and was a direct and proximate cause of the damages suffered by each of the Plaintiffs. The Municipal Defendants knew or should have known of the serious risk that these policies, training protocols, and customs would result in unconstitutional conduct, as it did here by depriving Courchesne of access to medication to treat his OUD that he had been legally prescribed before his detainment, as a result of which he was caused to suffer a forced opioid withdrawal that exacerbated and worsened his alcohol withdrawal, which ultimately caused his death.

254.    By reason of the foregoing, Plaintiffs are entitled to recover all of their respective damages from the Municipal Defendants.

## THIRD CAUSE OF ACTION

### Violation of Title II of the Americans with Disabilities Act
### Against the Municipal Defendants

255.    Plaintiffs reiterate and re-allege each of the foregoing allegations with the same force and effect as if fully set forth herein.

256.    The Americans with Disabilities Act ("ADA") was enacted "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

257.    To prevent discrimination, 28 C.F.R. § 35.130(b)(7) requires a public entity to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the services,

program, or activity." 28 C.F.R. § 35.130(b)(7). The Municipal Defendants are each a public entity as defined in 42 U.S.C. § 12131(1).

258.    Courchesne had a disability within the meaning of the ADA, and was otherwise qualified to participate in programs, services, or benefits offered by the Municipal Defendants, including, but not limited to, addiction, medical and withdrawal related health services. Despite his known disability, the Municipal Defendants failed to reasonably accommodate his disability and, instead, discriminated against him by prohibiting him from receiving medication to treat his OUD that had been legally prescribed to him prior to his detainment.

259.    As a direct and proximate cause of the Municipal Defendants' violation of Title II of the ADA, Courchesne was caused to endure the severe pain and suffering of a forced Suboxone withdrawal when his Suboxone use was abruptly terminated, without any substitute treatment for his OUD or Suboxone withdrawal treatment being initiated, including hypertension, tachycardia, tremors and agitation, among other symptoms, which also exacerbated and worsened his alcohol withdrawal and, ultimately, contributed to his death.

260.    By reason of the foregoing, Plaintiffs are entitled to recover all of their respective damages from the Municipal Defendants.

### FOURTH CAUSE OF ACTION

**Violation of Title III of the Americans with Disabilities Act
Against NHS**

261.    Plaintiffs reiterate and re-allege each of the foregoing allegations with the same force and effect as if fully set forth herein.

262.    Title III of the ADA prohibits "discrimination on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations

of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).

263.    Under Title III of the ADA, discrimination includes a "failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations[.]" 42 U.S.C. § 12182(b)(2)(A)(ii).

264.    NHS contracted with the Municipal Defendants to provide medical and mental health services to detainees and inmates of the CCDOC, and serves over 40% of the State of New Hampshire, including, but not limited to, all of Carroll and Coös Counties and the 17-towns in Upper Grafton County. The operations of NHS affect commerce, and that it offers public accommodations within the meaning of the ADA.

265.    Despite his known disability, NHS failed to reasonably accommodate his disability and, instead, discriminated against Courchesne by prohibiting him from receiving medication to treat his OUD that had been legally prescribed to him prior to his detainment.

266.    As a direct and proximate cause of NHS's violation of Title III of the ADA, Courchesne was caused to endure the severe pain and suffering of a forced Suboxone withdrawal when his Suboxone use was abruptly terminated, without any substitute treatment for his OUD or Suboxone withdrawal treatment being initiated, including hypertension, tachycardia, tremors and agitation, among other symptoms, which also exacerbated and worsened his alcohol withdrawal and, ultimately, contributed to his death.

267.    By reason of the foregoing, Plaintiffs are entitled to recover all of their respective damages from the Municipal Defendants.

## FIFTH CAUSE OF ACTION

### Medical Malpractice and Negligence
### Against the Clinician Defendants and NHS

268.    Plaintiffs reiterate and re-allege each of the foregoing allegations with the same force and effect as if fully set forth herein.

269.    The Clinician Defendants and NHS, by and through its agents, servants and/or employees, including, but not limited to, the Clinician Defendants, owed and undertook a duty to Courchesne to possess and exercise the degree of knowledge, skill, and care ordinarily possessed and exercised by reasonably skillful, careful, and prudent medical and health care professionals engaged in a similar practice under the same or similar circumstances, which required them to act in accordance with accepted standards of medical care in diagnosing, treating, and providing medical care, treatment and service to Courchesne.

270.    As set forth in detail herein, the standard of care required the Clinician Defendants and NHS to stabilize the OUD Courchesne suffered through continuation of the medication he was legally prescribed before his detainment (Suboxone) or another OUD therapy concomitantly with treating his alcohol withdrawal with benzodiazepines in a hospital setting. Each of the Clinician Defendants and, consequently, NHS breached the standard of care by providing no treatment for his OUD and, instead, abruptly terminating his Suboxone use, causing him to suffer the effects of a forced opioid withdrawal, which exacerbated his concomitant alcohol withdrawal.

271.    Given the severity of his alcohol withdrawal upon detainment, together with his Suboxone use and OUD for which treatment was terminated, the standard of care required each of the Clinician Defendants to immediately transfer Courchesne to the hospital or another acute care

facility concomitantly with administering benzodiazepines upon each of their first encounters with him (i.e., Harrison and Soucy at 7:40 a.m. on October 1, 2022 and Olson at 10:00 a.m. on October 2, 2022). None of the Clinician Defendants met the standard of care through the wholly inadequate care they provided, as detailed herein.

272.    Confronted with clear, objective signs that the concomitant alcohol and Suboxone withdrawal Courchesne was suffering from was worsening during their respective encounters with him, each of the Clinician Defendants chose to effectively do nothing to mitigate the situation when they each knew or should have known that certain interventions (e.g., benzodiazepines, transfer to a hospital setting, stabilization of his OUD) would have easily prevented the worsening of his symptoms and his death. As a result, none of the Clinician Defendants could have reasonably believed in the legality of their actions.

273.    As set forth in detail herein, the Clinician Defendants and NHS, by and through its agents, servants and/or employees, including, but not limited to, the Clinician Defendants, failed to exercise the requisite degree of care in diagnosing, treating, and providing medical care, treatment and service to Courchesne, and were reckless, careless and negligent and departed from accepted standards of medical care in the treatment of Courchesne; in failing to adequately, properly and timely diagnose and treat Courchesne and his serious medical needs, including OUD, Suboxone withdrawal and alcohol withdrawal; in allowing, causing, permitting and failing to prevent Courchesne's serious medical conditions to worsen and cause his death; in failing to transfer Courchesne to a hospital, emergency department or acute care facility; in failing to timely and appropriately treat OUD, Suboxone withdrawal and alcohol withdrawal; in abandoning and failing to supervise and monitor Courchesne; in failing to timely and appropriate administer proper medications in adequate and sufficient dosages and at adequate and sufficient frequencies; in

failing to implement a plan of care consistent with accepted standards of medical care; in implementing a plan of care that departed from accepted standards of medical care; in violating the standards set forth in the ASAM Guidelines, BOP Guidelines, DOJ Guidelines and NCCHC Standards; in failing to develop, implement, and alter when necessary a care plan to meet Courchesne's serious medical needs; in prescribing and ordering improper and ineffective treatment; in failing to provide appropriate medical care when it was known or should have been known that such care was needed; in failing to maintain a proper and accurate medical record by failing to keep and maintain a medical record that fully and accurately reflects the care and treatment rendered and documents the condition of Courchesne; in failing to properly train and supervise individuals who provided care and treatment; in failing to have proper and adequate rules and regulations in effect; in failing to have sufficient and efficient personnel; in launching a force or instrument of harm; in aggravating, causing, contributing to, exacerbating, and worsening the condition of Courchesne; in performing medical services with negligence, gross negligence, recklessness and incompetent on more than one occasion; in providing medical services so inadequately that it rises to the level of wanton behavior; in performing medical services with gross incompetence; in attempting to cover up what occurred; in lacking the requisite degree of knowledge and skill, and failing to exercise the requisite degree of care; and Defendant was otherwise reckless, careless and negligent and departed from accepted standards of medical care in the care and treatment of Plaintiff.

274.    As a direct and proximate cause of the foregoing, Courchesne was forced to suffer from severe pain and suffering, including, but not limited to, symptoms of alcohol withdrawal that progressed to delirium tremens concomitantly with untreated OUD and opioid withdrawals due to the abrupt termination of his Suboxone use, which collectively caused him to suffer hypertension,

tachycardia, tremors, sweats, agitation, confusion and hallucinations so severe he believed that the devil and demons were dragging him to hell. Further, the Estate of Joseph Courchesne has been deprived of the earnings that Courchesne would have reasonably expected to earn over the course of his lifetime had his life not ended, together with funeral and burial expenses.

275.    As a direct and proximate cause of the foregoing, Mrs. Courchesne has suffered and will continue to suffer the loss of consortium, intimacy, service, society, and support of her husband; the loss of his income and earning capacity; and other benefits, including, but not limited to, pension benefits, health insurance, and other insurance and benefits. Further, Mrs. Courchesne has been forced and will continue to be forced to raise C.C. and J.C. without the parental guidance, service, and support of her husband; and due to the premature death of her husband, will be forced to contend with the issues and problems arising from the absence of a father-figure in the life of her children, C.C. and J.C.

276.    As a direct and proximate cause of the foregoing, C.C. and J.C. have suffered and will continue to suffer the loss of parental consortium, service, society, support, parental guidance and parental support of their father; the loss of the income and earning capacity of their father; and the loss of benefits, including, but not limited to, pension benefits, health insurance, and other such benefits to which they would have been entitled through their father. Further, C.C. and J.C. will be forced to grow-up without a father-figure, the absence of which will cause or increase the odds of them suffering the effects caused by such an absence, including diminished self-concept, compromised physical and emotional security, feelings of abandonment, self-loath, behavioral problems, difficulties with social adjustment, truancy, poor academic performance, alcohol and drug abuse, anxiety and depression, among others.

277.    By reason of the foregoing, Plaintiffs are entitled to recover all of their respective damages from the Clinician Defendants and NHS.

## SIXTH CAUSE OF ACTION

### Violation of The Rehabilitation Act of 1973
### Against the Municipal Defendants

278.    Plaintiffs reiterate and re-allege each of the foregoing allegations with the same force and effect as if fully set forth herein.

279.    Courchesne had a disability within the meaning of the Rehabilitation Act, and was otherwise qualified to participate in programs, services, or benefits offered by the Municipal Defendants, including, but not limited to, medical and mental health services.

280.    Under the Rehabilitation Act, the Municipal Defendants were responsible for ensuring that individuals in custody with known disabilities are provided with reasonable accommodations to prevent discrimination on the basis of disability and are not, on the basis of disability, excluded from participation in or denied the benefits of its services, programs, or activities because of their disability.

281.    The Municipal Defendants receive federal funding.

282.    Despite his known disability, the Municipal Defendants failed to reasonably accommodate his disability and, instead, discriminated against Courchesne by prohibiting him from receiving medication to treat his OUD that had been legally prescribed to him prior to his detainment.

283.    As a direct and proximate cause of the Municipal Defendants' violation of the Rehabilitation Act, Courchesne was caused to endure the severe pain and suffering of a forced Suboxone withdrawal when his Suboxone use was abruptly terminated, without any substitute treatment for his OUD or Suboxone withdrawal treatment being initiated, including hypertension,

tachycardia, tremors and agitation, among other symptoms, which also exacerbated and worsened his alcohol withdrawal and, ultimately, contributed to his death.

284.    By reason of the foregoing, Plaintiffs are entitled to recover all of their respective damages from the Municipal Defendants.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all claims so triable.

WHEREFORE, Plaintiffs demand judgment against Defendants to recover all damages properly recoverable, including punitive damages, together with interest and costs.

Dated: March 6, 2025

Respectfully Submitted,

/s/ Daniel C. Perrone
Daniel C. Perrone
**PERRONE LAW LLC**
3600 NJ-66, Suite 150
Neptune, New Jersey 07753
(833) 287-6748
dcp@theperronefirm.com

Arend R. Tensen
**CULLENBERG & TENSEN, PLLC**
199 Heater Road, Suite 2
Lebanon, NH 03766
(603) 448-7100
tensen@nhvt-injurylaw.com